No. 54,707

STEVEN L. HARPER and NANCY HARPER, as Guardians, Adoptive parents and next of friends of Eric Harper, formerly Eric Fenton, for and on his behalf as next of friend, *Plaintiffs-Appellees*, v. PRUDENTIAL INSURANCE COMPANY OF AMERICA, *Defendant-Appellant.*

(662 P.2d 1264)

Opinion filed April 29, 1983.

*Brian G. Grace,* of Curfman, Harris, Stallings, Grace & Snow, of Wichita, argued the cause, and *Susan K. McKee,* of the same firm, was with him on the briefs for the appellant.

*John V. Black,* of John V. Black, Chartered, of Pratt, argued the cause, and *Russell L. Mills,* of the same firm, was with him on the brief for the appellees.

The opinion of the court was delivered by

PRAGER, J.: This is an action on a life insurance policy brought against the defendant, Prudential Insurance Company of America, by the contingent beneficiary after the insurance company had previously paid the designated primary beneficiary. The named insured was Jan E. Fenton, wife of Norman R.

Fenton, who was the primary beneficiary under the policy. The contingent beneficiary was the plaintiff, Eric Harper, the infant child of Jan E. Fenton.

The facts in the case are undisputed. The trial court made findings of fact which were stipulated by the parties to be as follows:

(1) Defendant, Prudential Insurance Company of America, issued its Policy No. 38 236 507 on or about October 14, 1975, insuring the life of Jan E. Fenton in the face amount of $20,000 with additional accidental death benefits in the amount of $40,000. The policy became due and payable upon receipt at the home office of due proof that the insured's death occurred while the policy was in force. The policy provided that upon request and due proof that the insured's death resulted directly, and independently of all other causes, from accidental bodily injury, Prudential would pay the accidental death benefit specified above. The policy listed "beneficiaries in order of priority" as "Class 1 - Norman R. Fenton" and "Class 2 - Children of the Insured."

(2) The sole Class 2 beneficiary of the insured is Eric Harper who was eight (8) weeks old at the time of the murder of the insured.

(3) On November 28, 1975, Jan Fenton was found dead in the bathroom of her home, located in Barber County. This was after her husband had reported her death to the authorities, claiming he had found her there.

(4) Jan Fenton had been shot in the head some time between 9:00 and 10:00 p.m. The murder weapon was a .22 Savage automatic rifle. Norman Fenton, her husband and the primary beneficiary of the insurance policy, owned the rifle.

(5) The primary beneficiary, Fenton, kept the .22 rifle in a corner of a room near the dining room area of the home. There were spent casings found in the dining room area, adjacent to the bathroom where Jan Fenton's body was found. The murder weapon could not be located at the time of the report but was subsequently recovered approximately 2 ½ years later from the Barber County State Lake where Fenton had thrown it.

(6) There was no evidence of attempted rape, burglary, robbery, or other crime, and there was no sign of a struggle. Jan

Fenton's clothes had not been disturbed and the house was undamaged.

(7) The primary suspect in the murder was Norman Fenton. Jan Fenton kept the doors locked, but there was no evidence of forced entry.

(8) Everyone connected with the investigation of the murder agreed that it was not a suicide.

(9) Even the prime suspect, Norman Fenton, said his wife had been murdered, but no one saw anyone enter or leave the home. Fenton was known to have a drinking problem and also to use drugs. He was also a known thief, pimp, snitch, and habitual liar. On or about December 4, 1975, Norman Fenton completed, signed, and caused to be forwarded to defendant a "Request for Life Insurance Policy Benefits" under the policy and provided due proof that Jan Fenton had been killed on November 28, 1975. The same was received at Prudential's home office together with a newspaper report indicating foul play was involved in the insured's death.

(10) Upon review of the proofs of death submitted, including the newspaper article, defendant made the decision on December 10, 1975, to investigate the circumstances of the insured's death and the status of any criminal investigation relative thereto. The defendant's investigation was conducted on January 20 and 21, 1976, by defendant's investigator, James C. King.

(11) Pursuant to this decision, King, a home office representative of defendant, interviewed law enforcement personnel with the following results:

(a) Judge McDaniel, a judge of the Barber County court, in a conversation with King, let it be known that he had a pretty good idea that the beneficiary, Norman Fenton, was involved in the killing of the insured.

(b) Sheriff John K. Blunk of Barber County, Kansas, stated that it was his opinion that the primary beneficiary, Norman Fenton, had killed the insured, Jan E. Fenton.

(c) Richard Raleigh, county attorney, Barber County, Kansas, stated that it was his opinion that the primary beneficiary, Norman Fenton, had killed the insured, Jan E. Fenton. Raleigh also stated that all the circumstantial evidence points toward the beneficiary, Norman Fenton, and that they had no other suspect. Raleigh did indicate that he did not have

enough evidence to make an arrest, but he felt that the primary beneficiary, Fenton, would stub his toe.

(d) Tom Lyons, of the Kansas Bureau of Investigation, when asked by King if the beneficiary killed the insured, stated, "Of course, he killed his wife. No one else was involved." Lyons also asked Prudential's investigator, King, if it would be possible for Prudential to be slow in making the payment of the proceeds. Lyons felt that it would be to the State's advantage for the beneficiary to stew before receiving payment from Prudential. Lyons indicated to Prudential's investigator that the KBI was still working on the case, and that the KBI was waiting for the beneficiary to make a mistake. Lyons hoped that it might be possible for Prudential to delay payment of the insurance proceeds.

(e) The primary beneficiary, Norman Fenton, in his interview with King, threatened King by making, "some type of vulgar, unspecific threat against me in the event I didn't handle the case in the manner he felt proper. He said had I not appeared he was going to call the state's insurance commissioner."

(12) Pursuant to this decision, James C. King interviewed law enforcement personnel with the following results:

(a) Sheriff John K. Blunk of Barber County, Kansas, on January 20, 1976, informed King that "he has no proof or sufficient evidence to charge the beneficiary with murder."

(b) Richard Raleigh, county attorney, Barber County, Kansas, on January 20 and 21, 1976, informed King that "he hasn't enough proof to make an arrest."

(c) Tom Lyons of the Kansas Bureau of Investigation on January 26, 1976, informed King that "they don't have enough evidence to make an arrest."

(d) On January 20, 1976, the beneficiary, Norman R. Fenton, advised the defendant's home office representative that "he hasn't done anything wrong, he passed four polygraphs. He's been cleared by the KBI."

(13) Defendant's investigator, King, submitted a report dated February 3, 1976, to defendant's home office for evaluation. Within his report, King concluded as follows:

"It is quite easy for anyone to rule out suicide. I am probably over 99% certain that the beneficiary either planned or in an act of passion shot and killed the insured. The physical evidence is quite strong. If one listens to the beneficiary's story it is easy to be convinced that he is not telling the truth . . . . A five foot eight inch subject holding a rifle looking through the scope would fire

approximately 51 inches at a slight downward angle. The downward trajectory between the insured and the window pretty well check out. I am convinced the beneficiary fired both shots  .  .  .  .  *I believe that there is enough doubt that we could with justification delay payment.*" (Emphasis supplied.)

(14) The remedy of interpleader is available to parties who might be in peril in cases such as this. The defendant totally failed to avail itself of the protection of the remedy.

(15) On February 13, 1976, approximately 10 days following the receipt of its investigator's report, defendant Prudential paid the proceeds of the policy to the primary beneficiary, Norman R. Fenton.

(16) The primary beneficiary, Fenton, was indicted for the killing of the insured in 1978.

(17) The primary beneficiary, Fenton, was convicted on April 13, 1979, of murdering Jan Fenton. When the insurance policy proceeds were paid to Norman Fenton, the KBI investigation and the Barber County sheriff's office investigation into the murder were still focused on the primary beneficiary, Norman Fenton.

(18) Shortly after the primary beneficiary, Norman R. Fenton, was convicted of the murder of Jan Fenton, Steven L. Harper and Nancy Harper, as the guardians of Eric Harper (formerly Eric Fenton), filed this action to recover the proceeds of the insurance policy on his behalf.

In addition, defendant requested that the trial court make the following finding of fact:

"The report of James C. King was returned to the Houston home office of the defendant for evaluation. There it was reviewed by defendant's law department, based on existing Kansas law at that time and the status of the investigation (see King report and King affidavit). The law department advised the claim department that since there was no prospect for arrest, much less indictment or conviction, Prudential Insurance Company was legally obligated to pay Mr. Fenton the proceeds of the policy (whether or not he had feloniously taken the life of Jan E. Fenton, the insured)."

The court did not make any specific determination as to this proposed finding of fact.

Since the facts were undisputed, each of the parties filed a motion for summary judgment in the trial court. Although their construction of the facts differ slightly, there was no dispute between the parties as to what actually happened, only as to the significance of various happenings. The district court granted the

motion for summary judgment filed by the plaintiff and denied defendant's motion. The court entered judgment in favor of plaintiff on the insurance policy in the amount of $60,000, the face amount of the policy including an additional payment for accidental death. In addition, the trial court awarded plaintiff the sum of $20,000 attorney fees and also prejudgment interest from March 4, 1980, when defendant denied plaintiff's claim until the date of judgment.

Prudential has appealed, contending that the findings of fact made by the trial court did not support summary judgment for the plaintiff but rather required that summary judgment be entered in favor of defendant. In addition, defendant contends that the plaintiff was not entitled to an allowance of attorney fees or prejudgment interest.

The issues presented on appeal are essentially as follows:

(1) Under the undisputed factual circumstances and with the knowledge the defendant insurance company had at the time payment was made to the primary beneficiary, what was the duty the insurance company owed to protect the interests of the contingent beneficiary, Eric Harper?

(2) Did the defendant insurance company breach its duty to the contingent beneficiary by paying the primary beneficiary ten days after receipt of its investigator's report and by its failure to bring an interpleader action to afford the contingent beneficiary an opportunity to protect his interests?

(3) Was plaintiff entitled to an award of attorney fees in the action?

(4) Was plaintiff entitled to prejudgment interest from March 4, 1980, to the date of judgment?

Before proceeding to a determination of the issues presented, we should consider certain general principles of law applicable where the designated beneficiary in a policy of life insurance feloniously kills or intentionally procures the killing of the insured. The general rule followed throughout the United States is that, if a person who is designated as beneficiary in a policy of life insurance feloniously kills the insured, he will be barred from recovering under the policy. See the annotation at 27 A.L.R.3d 794. The rule prohibiting the murdering beneficiary from receiving the proceeds is based in some jurisdictions upon common law apart from statute, although the rule has been

restated or redeclared by statute in a number of states. The reason for the rule seems to have been predicated upon the maxim of the common law that "no one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime." *Smith v. Todd,* 155 S.C. 323, 333, 152 S.E. 506 (1930). Cases supporting this rule are set forth in 4 Couch on Insurance 2d § 27.149 (1960), and in annotations in 70 A.L.R. 1539 and 91 A.L.R. 1486.

Under the common-law rule the beneficiary is barred without regard to whether he is subsequently tried and convicted for the killing of the insured. In some states, the common-law rule continues under which the conviction of the beneficiary is required, but by statute a conviction, in the event that there is one, is made conclusive proof of the fact that the beneficiary had killed the insured. Accordingly, the rule is applicable to bar the estate of the beneficiary, although he committed suicide and thus was never convicted for the offense of killing the insured. In some states, including Kansas, the beneficiary is not barred until he has been actually convicted of the murder of the insured. The rule requiring a conviction in order to bar the beneficiary is contrary to the general rule which is followed in all but a few of the jurisdictions in the United States.

It would clarify the issue to review the background of the rule which has been developed in Kansas down through the years. The first Kansas case on the subject did not actually involve the right of a beneficiary to recover under an insurance policy but rather the right of a husband to inherit from his deceased wife, where the husband feloniously killed his wife for the purpose of obtaining her property. In *McAllister v. Fair,* 72 Kan. 533, 84 Pac. 112 (1906), a husband feloniously killed his wife. Her brothers and sisters, as her nearest blood relatives, claimed her estate, claiming that the husband's crime disabled him from taking any interest in her estate. The plaintiffs complained and insisted that a murderer should not be permitted to inherit the estate of his victim, relying on the common-law rule. Chief Justice Johnston, writing for the court, held that the subject of devolution of the wife's property was controlled by the Kansas statutes pertaining to the descent and devolution of property. Section 2521 of the General Statutes of 1901 provided:

"If the intestate leave no issue, the whole of his estate shall go to his wife; and if he leave no wife nor issue, the whole of his estate shall go to his parents."

Section 2529 provided that the provisions made in relation to the widow of a deceased husband are applicable to the husband of a deceased wife. The opinion concluded that the statutes should be enforced to the letter and, since the legislature had not made any exception in situations where a husband killed his wife, the husband could inherit by intestate succession.

The court in the opinion stated as follows:

"That any one should be given property as the result of his crime is abhorrent to the mind of every right-thinking person, and is a strong reason why the lawmakers, in fixing the rules of inheritance and prescribing punishment for felonious homicide, should provide that no person shall inherit property from one whose life he has feloniously taken. . . . The horror and repulsion caused by such an atrocity, however, do not warrant the court in reading into a plain statutory provision an exception which the statute itself in no way suggests." p. 535.

On page 537 of the opinion, the court noted that a different rule may be applicable in cases involving *insurance policies,* wills, and the like, stating as follows:

"There is a manifest difference, however, between private grants, conveyances and contracts of individuals and a public act of the legislature. It might be that a person would not be permitted to avail himself of the benefits of an insurance policy the maturity of which had been accelerated by his felonious act. Many considerations of an equitable nature might affect the operation or enforcement of a grant or contract of a private person which would have no application or bearing on a statute enacted by the legislature."

In 1907, the legislature responded to correct the undesirable situation resulting from the decision in *McAllister.* It enacted R.S. 1923, 22-133 which provided as follows:

"Any person who shall hereafter be convicted of killing or of conspiring with another to kill or of procuring to be killed, any other person from whom such person so killing or conspiring to kill or procuring said killing would inherit the property, real, personal, or mixed, or any part thereof, belonging to such deceased person at the time of death, or who would take said property by deed, will or otherwise, at the death of the deceased, shall be denied all right, interest and estate in or to said property or any part thereof, and the same shall descend and be distributed to such other person or persons as may be entitled thereto by the laws of descent and distribution, as if the person so convicted where dead."

In *Hogg v. Whitham,* 120 Kan. 341, 242 Pac. 1021 (1926), the court construed R.S. 1923, 22-133 as requiring the disqualifying criminal act be established by a *conviction* of the beneficiary and that without a conviction in a criminal action the statute did not

bar a husband from inheriting the property of his wife by intestate succession. It was held that a verdict of a coroner's jury alone finding that the husband had murdered his wife was not sufficient to bar the husband from inheriting from his wife.

The first Kansas case actually involving the question of whether the beneficiary of a life insurance policy who kills the insured is barred from receiving the proceeds of a life insurance policy was *Noller v. Aetna Life Ins. Co.*, 142 Kan. 35, 46 P.2d 22 (1935). In *Noller*, the opinion took notice of R.S. 1923, 40-414 (1933 Supp.) which provided, in substance, that any life insurance policy shall inure to the sole and separate use and benefit of the *beneficiaries named therein*, and shall be free from the claims of the assured, and shall also be free from the claims of the person or persons effecting such insurance, their creditors and representatives. The court concluded from that statute that it is the public policy of our state thus stated in language "as plain and unambiguous as the law of descents and distributions" that the proceeds of an insurance policy shall go to the beneficiary named in the policy. The court further noted the language in R.S. 1923, 22-133 that any person who shall be convicted of killing another person from whom such person would inherit property or who would take property by deed, will *or otherwise*, shall be denied all right to such property. It was held that the words "or otherwise" would apply to a case where the person who did the killing was the beneficiary in an insurance policy. The court then reasoned that since R.S. 1923, 22-133 only bars the killer when he has been *convicted* of a crime, if the beneficiary has not been convicted, he is entitled to the proceeds of the policy.

In 1939, R.S. 1923, 22-133 was amended and later codified as K.S.A. 59-513 (Corrick) as follows:

"No person who shall be convicted of feloniously killing, or procuring the killing of, another person shall inherit or take by will or otherwise from such person any portion of his estate."

The first case to interpret K.S.A. 59-513 (Corrick) was *In re Estate of Pyke*, 199 Kan. 1, 427 P.2d 67 (1967). In *Pyke*, a husband shot and killed his wife and shortly thereafter committed suicide. A controversy arose between the administrators of the husband's and wife's estates as to whether the husband's estate would be entitled to a distribution from the property of the wife's estate and the proceeds of a life insurance policy on the

wife's life. There was no question in the case that the husband had first shot his wife, but he could not be convicted of the crime because he immediately killed himself. The court concluded that 59-513 did not bar the husband's estate, reasoning that in order for a beneficiary of a life insurance policy who kills the insured to be barred from receiving the benefits of the policy, the beneficiary must first be convicted of the crime. There being no conviction, the husband's estate was held to be entitled to the proceeds of the insurance policy.

In 1970, the legislature amended K.S.A. 59-513 to make the statute applicable to a surviving joint tenant and a beneficiary under a trust or otherwise. A proviso was added that when any person shall kill or cause the killing of his or her spouse, and shall then take his or her own life, the estates and property of both persons shall be disposed of as if their deaths were simultaneous pursuant to the provisions of K.S.A. 58-701 through 58-705. The most recent case recognizing the rule requiring a conviction of feloniously killing before a beneficiary under a life insurance policy is barred from receiving the proceeds is *Chute v. Old American Ins. Co.*, 6 Kan. App. 2d 412, 629 P.2d 734 (1981).

We have analyzed these Kansas cases and concluded that the rule that there must be a conviction of the beneficiary before he may be barred from recovering the proceeds of a life insurance policy was ill conceived and should no longer be followed in this state and that we should adopt the common-law rule which is almost universally followed in this country and which bars the beneficiary of a life insurance policy who feloniously kills the insured from recovering under the policy whether convicted or not. This rule should be applied in this case and in all future cases now pending or hereafter filed in the courts of this state. In arriving at this result, we have reconsidered the language in K.S.A. 59-513 and concluded that the statute is applicable in situations where there has actually been a conviction of the beneficiary and bars him from recovering under an insurance policy. The statute does not preclude judicial application of the common-law rule in cases where the beneficiary killed the insured but has not been convicted of the crime.

There are a number of states which have statutes similar to K.S.A. 59-513. A number of those states hold that the statute

which prohibits a beneficiary convicted of killing the insured from recovering the proceeds under the insurance policy does not change the rule of public policy which prevents such recovery although the beneficiary has not been convicted. In *Smith v. Todd,* 155 S.C. 323, it was held that the fact that the primary beneficiary, who feloniously killed his wife, was not prosecuted for the killing because he committed suicide after the murder was not a sufficient reason to entitle his estate to the proceeds of the policy. Although the South Carolina statute prohibited recovery by a beneficiary who is *convicted* of unlawfully killing the insured, the court concluded that the statute did not change the rule of public policy barring from recovery beneficiaries who committed such acts, whether or not they are convicted for the crime. See also to the same effect *Keels v. Atlantic Coast Line R. Co. et al.,* 159 S.C. 520, 157 S.E. 834 (1931).

In *Continental Bank and Trust Company v. Maag,* 285 F.2d 558 (10th Cir. 1960), the insurance company brought an interpleader action to compel the estate of the primary beneficiary and contingent beneficiaries to litigate their conflicting claims to the proceeds of the policy. The primary beneficiary had killed his wife, the insured, and then committed suicide. A Utah statute prohibited a person convicted of unlawfully killing another from taking property from the latter. The primary beneficiary's administrator argued that, since there had been no conviction, his estate and not the contingent beneficiaries was entitled to the proceeds. The court held that the state statute pertaining to convictions did not change the rule of public policy against allowing a beneficiary who kills the insured to recover the proceeds of the policy and that a conviction was not required.

A more recent case on this point is *Lofton v. Lofton,* 26 N.C. App. 203, 215 S.E.2d 861 (1975). There a statute of North Carolina provided that a person convicted of a willful killing of another is barred from receiving the proceeds of a life insurance policy on the life of the deceased. It was held by the North Carolina court that the statute did not abrogate the common-law principle that a person should not be allowed to profit from his own wrong and that the primary beneficiary could be barred from recovering the proceeds of the policy in spite of the fact he had not been convicted of the crime in a criminal action, the principal beneficiary being only a juvenile.

From our reexamination of K.S.A. 40-414, which is the same statute before the court in *Noller* in 1935, we find no legislative expression of a public policy that the proceeds of an insurance policy must be paid to the beneficiary even though the beneficiary feloniously kills the insured. In substance, the statute simply states that all insurance policies and their reserves shall inure to the sole and separate use of the beneficiaries named therein, and shall be free from the claims of the assured and of the persons effecting such insurance as their creditors and representatives. We hold that the court in *Noller* was in error in concluding otherwise. We, therefore, overrule any statements to the contrary contained in *Noller, In re Estate of Pyke,* and *Chute.*

We turn now to a consideration of the issue raised on the appeal pertaining to the duty owed by the defendant insurance company to the contingent beneficiary, Eric Harper, at the time payment was made to the primary beneficiary, Norman Fenton. We have no cases in Kansas directly in point which define the duty of an insurance company to withhold payment from the primary beneficiary where it has notice and knowledge of facts which may defeat the claim of the primary beneficiary. There are, however, a number of similar cases from other jurisdictions where an insurance company has been held liable to a contingent beneficiary or to the estate of the insured where the insurance company, having knowledge of facts which may defeat the claim of the primary beneficiary, paid the primary beneficiary without notice and without bringing an interpleader action so as to afford the contingent beneficiary or the insured's estate an opportunity to protect its interest.

In *Glass v. United States,* 506 F.2d 379 (10th Cir. 1974), the insured, Glass, died as a result of gunshot wounds. At the time of his death, Glass was insured under a $10,000 national service life insurance policy issued by the Veterans Administration. The primary beneficiary was Glass's second wife, Rebecca. The children of his first marriage were the contingent beneficiaries. The primary beneficiary filed a claim for the policy proceeds. Before payment was made, a grand jury returned an indictment against Rebecca charging her with Glass's murder. The Veterans Administration was notified of the indictment. Notwithstanding that notification, the VA made a decision awarding the proceeds

to the second wife. This was done without giving any notice to the contingent beneficiaries. Several months later, Rebecca was found guilty of murder, and the contingent beneficiaries then made the claim upon the VA for the proceeds of the policy. This claim was denied. The trial court held in favor of the plaintiffs and permitted them to recover on the insurance policy. On appeal, the Court of Appeals affirmed, holding that, under the factual circumstances, the VA could not avoid its obligation to pay the proceeds to the contingent beneficiaries because it had *negligently* and erroneously paid the proceeds to the primary beneficiary. The VA could easily have avoided double payment by filing an interpleader action which is specially designed for cases of this type.

The general rule which governs the liability of an insurance company for payment to a contingent beneficiary after a previous payment to a primary beneficiary is stated in *Weed v. Equitable Life Assurance Society of U.S.*, 288 F.2d 463 (5th Cir. 1961), as follows:

"Payment in good faith to the beneficiary of record by the insurance company without knowledge of facts vitiating the claim will prevent a second recovery by another claimant."

In support of this rule, the court in *Weed* cited *Daniels v. Grand Lodge*, 62 S.W.2d 548 (Tex. Civ. App. 1933); *Avondale v. Sovereign Camp, W.O.W.*, 134 Neb. 717, 279 N.W. 355 (1938).

In a more recent case, *In re Estate of Thompson*, 99 Ill. App. 3d 303, 426 N.E.2d 1 (1981), it was held that an insurance company which pays the proceeds to the named beneficiary is discharged from liability on the policy if it acted in good faith, and that the obligation of good faith requires a reasonable and prudent prepayment investigation when the company is aware of suspicious circumstances involving the beneficiary in the death of the insured. The obligation of good faith is not violated unless a reasonably prudent investigator would have uncovered facts which would have defeated the beneficiary's claim. Whether or not the insurer carried out its obligation was a question of fact to be determined by the trial court.

Under the law as it existed in Kansas at the time this case arose, the primary beneficiary, Norman Fenton, had a right to the proceeds of the insurance policy until he had actually been convicted of the felonious killing of his wife. However, he has

been convicted and no longer has a right to those proceeds. The contingent beneficiary, Eric Harper, is entitled to them under the law. The difficulty arose in this case because Prudential Insurance Company paid the proceeds to Norman Fenton about three years before his conviction. The question thus becomes whether Prudential's payment of the proceeds to Fenton relieved it of its obligation to pay the proceeds to the contingent beneficiary, Eric Harper.

The law simply could not be that, if the primary beneficiary has not yet been convicted, the insurance company is completely free to pay the beneficiary at any time after the death of the insured. Such a rule would destroy the intent of K.S.A. 59-513, because in many cases the beneficiary who has killed the insured will not be convicted for several months after the killing has occurred. Reason and justice require that a duty be placed upon the insurance company to wait a reasonable time after the death of the insured to allow the law enforcement agencies to complete their investigation. Certainly if a prosecution is actually commenced, the insurance company should delay payment until the outcome of the prosecution is known.

The basic issue in this case then becomes: What was the obligation of the insurance company in regard to paying the proceeds when the primary beneficiary had not yet been charged or indicted? We have no Kansas cases directly on that point. *Noller* and *Pyke* are not helpful, because in each of those cases there was no possibility that the beneficiary would be convicted, since he or she had taken his own life. As noted above, the insurance company is to be relieved from liability only if it paid the proceeds to the primary beneficiary in good faith and *without knowledge of facts which may defeat the primary beneficiary's claim.* In *Glass,* the court placed great weight on the fact that the insurance company (VA) could have filed an interpleader action and protected itself. In *Glass,* it was also noted that, if the contingent beneficiary is a minor, more caution may be required of the insurance company.

In the case now before us, Prudential conducted a complete investigation. It's investigator found and advised Prudential that, with 99% certainty, the beneficiary had killed the insured. Prudential paid the primary beneficiary although it knew that Tom Lyons of the Kansas Bureau of Investigation had asked Pruden-

tial's investigator, James King, if it would be possible for Prudential to be slow in making the payment of the proceeds, and although James King, the investigator, had stated to Prudential that there was enough doubt that it could with justification delay payment of the proceeds to Fenton. In spite of this complete investigation and these recommendations, Prudential paid Fenton ten days after receipt of the investigator's report. As a result, Eric Harper, the contingent beneficiary, an infant of only a few months, had no way to protect his interest.

We have concluded that, under all the circumstances, Prudential should have either delayed making payment to Fenton or filed an interpleader action. By interpleading the contingent beneficiary so that he might have an opportunity to protect his rights, Prudential could have protected itself from a double liability. Clearly an insurance company should not make payment to the primary beneficiary where it has been specifically notified by the criminal authorities that an investigation of the beneficiary's participation in the killing of the insured is still continuing and the case has not yet been closed. We, thus, hold that the judgment of the trial court in favor of the plaintiff, Eric Harper, in the amount of $60,000 should be affirmed.

The next issue raised by the defendant is whether the plaintiff is entitled to recover attorney fees because Prudential refused to make payment on plaintiff's demand. The right to recover attorney fees on insurance policies is covered by K.S.A. 40-256 which provides, in substance, that in an action on an insurance policy, the trial court shall allow attorney fees if it appears from the evidence that the insurance company has refused *without just cause or excuse to pay the claim*. Whether or not an insurance company has refused without just cause to pay a claim depends on the facts and circumstances of the particular case. *Clark Equip. Co. v. Hartford Accident & Indemnity Co.*, 227 Kan. 489, 493, 608 P.2d 903 (1980). In *Clark*, the court stated that if there is a good faith legal controversy as to liability, attorney fees must be denied. The court also stated that if there is a *bona fide* and reasonable factual ground for refusing to pay a claim, attorney fees are not awardable. Under the circumstances here and because of the novelty of the issue involved, we find there was a *bona fide* question involved and, thus, no attorney fees should

have been awarded to the plaintiff. The judgment is modified on that point.

The final point is whether prejudgment interest should have been awarded to the plaintiff. The amount owed on the policy was a liquidated sum of $60,000. Plaintiff was either entitled to recover that amount or nothing. The trial court held that plaintiff was entitled to prejudgment interest, from March 4, 1980, when defendant denied plaintiff's claim until the date of judgment. We find no error in that order.

The judgment of the district court is affirmed but modified to deny attorney fees in accordance with the opinion.

LOCKETT, J., dissenting: The effect of this decision will cause insurance companies, where an insured dies due to unexplained causes or under suspicious circumstances, to withhold payment of the proceeds of the policy. The proceeds of the policy would be withheld by the insurer until authorities have determined the insured died of natural causes. If the insured died under suspicious circumstances, the proceeds should be withheld until the insurance company's investigator or the authorities determine that the primary beneficiary is not under suspicion for causing the death of the insured.

Interpleading will protect the secondary beneficiaries where the insured dies under suspicious circumstances and the primary beneficiary is suspected of killing the insured. It will also dissipate the proceeds of the insurance policy due to the cost of the action. We are in addition requiring the primary beneficiary in a civil action to prove (1) that the insured did not die under suspicious circumstances, or (2) that the primary beneficiary is beyond a reasonable doubt innocent of causing the insured's death. The primary beneficiary would be required to defend in a civil suit even though he may never be prosecuted for causing the death of the insured.

If we are going to adopt the common-law rule we should also set forth what is a reasonable time for an insurance company to withhold payment of proceeds of the policy to the primary beneficiary or file an interpleader action. It would be reasonable for the insurance company to withhold payment of the policy proceeds to the primary beneficiary for a period of 30 days from the date of death for the State to determine if it is going to prosecute the primary beneficiary for the death of the insured. If

prosecution is commenced within the 30-day period, the insurance company should file an interpleader action to determine if the primary beneficiary is barred from obtaining the policy proceeds.

I respectfully submit the judgment of the trial court should be reversed.

SCHROEDER, C.J., joins the foregoing dissenting opinion.