## REGIONAL INVESTMENT COMPANY, Appellee,

v.

**Allen Peter Dennis HAYCOCK; Bellefonte Underwriters Insurance Company —U.S.A.; Bellefonte Insurance Company—International; Excess Insurance Company; Assicurazioni Generali Company; and Bankers Insurance Service Corporation, Appellants.**

No. 83–1008.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1983.

Decided Dec. 15, 1983.

F. Philip Kirwan, John M. Cave, II, Kansas City, Mo., for appellants; Margolin & Kirwan, Kansas City, Mo., of counsel.

Michael W. Lerner, Mary L. Barrier, Stinson, Mag & Fizzell, Kansas City, Mo., for appellee Regional Investment Co.

Before LAY, Chief Judge, and HEANEY and ARNOLD, Circuit Judges.

ARNOLD, Circuit Judge.

Plaintiff Regional Investment Company is a Kansas mortgage-banking corporation. Defendants are Allen Peter Dennis Haycock, an underwriter at Lloyds, London, appearing as named defendant on behalf of certain other underwriters at Lloyds; Bellefonte Underwriters Insurance Company— U.S.A.; Bellefonte Insurance Company— International; Excess Insurance Company; Assicurazioni Generali Company (collectively referred to as "underwriters"); and Bankers Insurance Service Corporation. In this diversity case, Regional brought an action against defendants under a mortgage bankers' blanket bond to recover losses caused by forgery of a Veterans Administration Certificate of Commitment, which, according to plaintiff, had induced it to lend money on the security of a certain house. The jury returned a verdict for Regional and assessed damages at $45,000.00.

All defendants filed motions for a new trial or in the alternative for judgment notwithstanding the verdict. Plaintiff filed a motion for attorneys' fees and expenses.

Defendant Bankers Insurance Service Corporation was granted judgment notwithstanding the verdict, and this action is not before us on this appeal. The District Court[1] denied the underwriters' motion. Regional's motion for attorneys' fees and expenses was granted. The underwriters appeal the adverse judgment and plaintiff's award of attorneys' fees. We affirm.

## I.

Because the jury verdict was for Regional we will state the facts in light of the evidence, and the reasonable inferences from the evidence, most favorable to Regional. *Dewitt v. Brown,* 669 F.2d 516, 518 (8th Cir.1982); *Alabama Great Southern Railroad Co. v. Chicago & Northwestern Railway Co.,* 493 F.2d 979, 983 (8th Cir.1974).

On April 5, 1979, Frederick E. English, a veteran, applied to Regional Investment Company's Houston, Texas, office for a residential loan to purchase property in Texas. The following day, Regional submitted a Veterans Administration Request for Determination of Reasonable Value (Real Estate). A Certificate of Reasonable Value issued from the V.A. on May 23, 1979. Charles Wakefield was Regional's employee in its Houston office handling English's loan. Regional's normal procedure, after receipt of a Certification of Reasonable Value, was to apply for a V.A. Certificate of Commitment. Issuance of a loan is contingent upon Regional's receipt of a Certificate of Commitment.

Regional received a Certificate of Commitment dated June 1, 1979, bearing the signature of an Anthony Lorino. In reliance on the Certificate of Commitment, Regional lent $90,000 to English. Regional subsequently assigned the loan, as part of a pool of similar mortgages, to the Government National Mortgage Association (GNMA).

English defaulted on the loan before making any payments. After the default, Regional learned that Anthony Lorino's signature was a forgery, and that no Certificate of Commitment ever issued from the V.A. Regional suspected Charles Wakefield of the forgery. Because of the forgery, Regional became obligated to GNMA for the full amount of the loan balance plus interest. To fulfill that obligation, Regional repurchased the English note from GNMA for $93,746.62.

Regional notified the underwriters of the forgery. It continued to keep the underwriters posted of developments in relation to the loan. Regional informed the underwriters that it would follow its usual procedure, which was to foreclose on the property. The underwriters assented to Regional's use of its usual procedure (although they later contended that they did not agree to a foreclosure). A foreclosure sale was held; Regional was the only bidder at the sale, and it bid $97,530.20, the amount of the loan plus accrued interest and certain other expense items. Regional later sold the property for a net price of $34,091.40. The decrease in value was at least partly due to vandalism on the property, most of which occurred before the foreclosure.

Regional sent a letter to Bankers Insurance Service Corporation claiming under the bond a loss of $72,287.87 resulting from acts of forgery or dishonesty. Plaintiff supplied information concerning the claim to the underwriters when requested. During the investigation, Regional provided Charles Wakefield's address on the condition that it be notified of and included in the underwriters' meeting with him. The underwriters agreed to this procedure, but in spite of that they held a meeting with Wakefield, at which he denied any forgery, and notified Regional only after the meeting had taken place.

The underwriters denied the claim. In the letter which notified Regional of the meeting between Wakefield and the underwriters, the underwriters' attorney stated that Wakefield denied either forging or fal-

---

1. The Hon. Joseph E. Stevens, Jr., United States District Judge for the Western District of Missouri.

sifying documents in connection with English's loan or receiving any improper personal gain. Regional then filed this action.

## II.

Defendant underwriters argue on appeal that Regional suffered no loss on the forgery because the foreclosure sale discharged the debt; that the trial court erred in giving and in denying certain jury instructions; and that the trial court erred in awarding attorney's fees.

■ The principal point urged on the merits is that plaintiff suffered no loss, because at the foreclosure sale it "received" $97,530.20, the amount of its bid. As this was exactly the amount at which the English loan was carried on Regional's books, the argument goes, Regional has been fully reimbursed, and no loss exists for which it can claim indemnity from the insurers. We disagree with this argument. If there had been another bidder at the foreclosure sale, and if Regional had therefore been forced to bid as much as it did to buy in the property, the argument would have substance. In that case, the money bid for the land would have represented a real payment to Regional, a real increase in its cash on hand, replacing the cash it had been forced to lay out to GNMA. But as it was, the $97,530.20 bid was in practical effect only a paper transaction, a bookkeeping device for obtaining title to the land. Regional could have bid a much lesser sum, presumably as low as one dollar plus the expenses of sale, and accomplished the same result. To be sure, the bid at the foreclosure sale, being equal to the full amount owed, extinguished the debt owed by the mortgagor, English. Regional could not have gone against him for a deficiency judgment. (And there is no reason to think that such a judgment would have been worth anything.) But that is not at all the same thing as saying that Regional has in fact suffered no economic loss.

■ Logically Regional's loss should equal the amount it paid GNMA to repurchase the loan, less the fair market value of the property when it bought it at the foreclosure sale. There is no direct evidence of fair market value at the time of the sale. Regional's theory seems to be that the $34,091.40 for which it sold the property some time later is a reasonable approximation of this value. If so, its loss would have been $93,746.62, the amount paid GNMA, less $34,091.40, or $59,655.20. The jury found that Regional's loss had been $45,000.00. The difference between this figure and $59,655.20 may represent the extent to which the jury thought that the vandalism that decreased the property's value somewhat should in fairness be regarded as Regional's responsibility. The appellant underwriters argue that the vandalism was more extensive than this, and that consequently the amount of Regional's loss chargeable against them should have been less. They may be right, but there is no definite evidence in this record as to the amount or timing of the vandalism. (Some of it occurred before Regional knew of English's default and its own duty to care for the property.) We must give the jury's verdict every reasonable indulgence. When we do so, we cannot say that the evidence was legally insufficient to support it. To put it a little differently, appellants have not succeeded in the difficult task of persuading us that the jury's verdict is so far from a fair estimate of Regional's loss as to justify judges, either trial or appellate, in disregarding it.

We have considered defendants' other arguments, relating primarily to jury instructions given or refused, and are satisfied that they are without merit. The District Court properly refused to grant the underwriters' motion for judgment *non obstante veredicto*.

## III.

■ The District Court made an award of attorneys' fees against the underwriters, finding that their failure to pay Regional's loss was "without just cause or excuse." The parties agree that Kansas law governs. K.S.A. § 40–256 authorizes an award of fees against an insurance company in such a case. The underwriters argue first that the

award should be reversed because Regional recovered less than the full amount sued for. In some states the point would be well taken. The Arkansas statute, Ark.Stat. Ann. § 66–3238, which provides for a 12% penalty in addition to attorneys' fees, has been strictly construed. The penalty and fees are not awarded unless the plaintiff recovers the exact amount sued for. *E.g., Bank of Mulberry v. Fireman's Fund Ins. Co.,* 720 F.2d 501 (8th Cir.1983). The Kansas statute, on the other hand, has not been so construed. It provides that the insurance company may make an offer of settlement before suit is commenced, and that fees will be awarded only if the amount later recovered exceeds the amount offered in settlement. (Here, the defendants made an offer, but it was only $25,000.00, so this requirement was satisfied when the jury came back with a verdict for $45,000.00.) Fees may be awarded when the amount recovered is more than the settlement offer but less than the amount sued for. Exactly that happened in *Attebery v. M.F.A. Mut. Ins. Co.,* 191 Kan. 178, 380 P.2d 327 (1963).

The underwriters also argue that they did have just cause or excuse for failing to pay. Their defenses, they say, even if unavailing in the end, were not frivolous and were advanced in good faith. See *Harper v. Prudential Ins. Co. of America,* 233 Kan. 358, 372–373, 662 P.2d 1264, 1274 (1983) (because of reasonable factual ground for refusing to pay claim plus novelty of the issue, no attorney's fees warranted); *Guarantee Abstract and Title Co., Inc. v. Interstate Fire and Casualty Co., Inc.,* 228 Kan. 532, 539–540, 618 P.2d 1195, 1201 (1980) (issue of insurer's liability for punitive damages was issue of first impression; dispute was a good-faith controversy and failure to settle did not warrant payment of attorney's fees).

Attorney's fees were allowed in *Steele v. General American Life Ins. Co.,* 217 Kan. 24, 32, 535 P.2d 948, 954 (1975). In *Steele,* the plaintiff's wife was an employee under a group insurance plan. The group policy was issued by defendant and covered the employee's dependents. Plaintiff's injuries resulted from gunshot wounds inflicted by plaintiff's wife. Plaintiff's insurer paid the bulk of the medical bills, and plaintiff sought the $219.00 balance from defendant. The court found a lack of just cause because as early as September 15, 1971, the insurance commissioner had advised defendant of the Kansas Supreme Court's holding in a similar case and recommended that the case be settled. It was not until January 11, 1973, after the case was pending in court and considerable time had been expended, that defendant offered to settle for $212.00.

We could cite other Kansas cases on the issue, but no useful purpose would be served. In the end, whether the defenses asserted by an insurance company amount to "just cause or excuse" is a question of judgment and degree, and "depends upon the facts and circumstances of each particular case." *Steele v. General American Life Ins. Co., supra,* 217 Kan. at 32, 535 P.2d at 954. *Accord, e.g., Harper v. Prudential Ins. Co. of America, supra,* 233 Kan. at 372–373, 662 P.2d at 1274. The present case is not closely similar to any reported Kansas case we have found. We approach the issue, moreover, with a large measure of deference to the District Court, which immersed itself in the facts of this case, in the conduct of the parties and their counsel, in a way that appellate courts never can. To the extent that the District Court's decision rested on the historical facts of what the defendants did in handling and rejecting the claim of Regional, we must accept its findings unless they are clearly erroneous, which they are not. And to the extent that the District Court's decision was an assessment of the "justness" of the "cause or excuse" advanced by the defendants, we should reverse it only if convinced that it was so far out of bounds as to deserve the label "abuse of discretion." Much the same standard is followed by the appellate courts of Kansas in reviewing trial courts' decisions as to "just cause." *Farm Bureau Mut. Ins. Co. v. Carr,* 215 Kan. 591, 598–599, 528 P.2d 134, 140 (1974) ("the issue is primarily one of fact to be determined in the first instance by the trial court"; decision af-

firmed because "we are not prepared to say that the trial court abused its discretion or that its finding ... is without support in the record.")

Here the principal defense offered—that Regional suffered no loss—may be substantial enough to escape absolute condemnation as frivolous, but it is completely unappealing as a matter of common sense, and it is hard for us to believe that its failure will come as any great surprise to the underwriters. The absence-of-loss theory seems not to have been offered at all as a justification for nonpayment until after the filing of suit. Before suit defendants based their refusal to pay on Charles Wakefield's denial that he had been the forger of Lorino's signature—a fact that, if true, would negative the underwriters' liability only under the fidelity coverage of the bond, which was not the only coverage that Regional claimed and which was not the coverage on which the jury based its verdict. The information from Wakefield, moreover, was obtained at an interview conducted without notice to Regional, despite the fact that counsel for the underwriters (not the same lawyers as are handling this appeal) had promised that she would give Regional notice and a chance to be present before interviewing Wakefield. The District Court was offended by this conduct, and we can see why. All things considered, we cannot say that the court below abused its discretion in making an award of fees. The amount of the award—about $17,000.00—is not drawn in question on this appeal.

Affirmed.