**Tammi LUNDSFORD, Lori Hustwaite, Kathy Webster, Perry E. Nelson, III, a minor, and Brook Erin Nelson, a minor, by and through their legal guardian ad litem Ellen Trujillo, Plaintiffs–Appellees and Cross–Appellants,**

v.

**WESTERN STATES LIFE INSURANCE and North American Life & Casualty Company, Defendants–Appellants and Cross–Appellees.**

No. 92CA0323.

Colorado Court of Appeals,
Div. IV.

Oct. 28, 1993.

Rehearing Denied Nov. 26, 1993.

Certiorari Granted May 16, 1994.

Haddon, Morgan & Foreman, P.C., Harold A. Haddon, Rachel A. Bellis, Haines & Olsen, P.C., Susan G. Haines, Denver, for plaintiffs-appellees and cross-appellants.

Phelps, Singer & Dunn, Alan Gary Dunn, Joan M. Riordan, Denver, for defendants-appellants and cross-appellees.

Opinion by Judge VAN CISE.*

Defendants, Western States Life Insurance (Western States) and North American Life & Casualty Company (NALAC), appeal the judgment entered on a jury verdict in favor of plaintiffs, Tammi Lunsford, Lori Hustwaite, Kathy Webster, Perry Edison Nelson, III, and Brooke Erin Nelson. Plaintiffs cross-appeal the trial court's rulings dismissing their additional claims for recovery against defendants. We reverse.

This case concerns the proper disposition of life insurance proceeds upon the death of the insured, Perry Nelson, who disappeared on July 23, 1983, while on a road trip. Within weeks before Mr. Nelson's disappearance, he and his wife, Sharon Nelson, had purchased a series of life insurance policies with death benefits in excess of $200,000. In December 1983, before Mr. Nelson's body had been discovered, Sharon Nelson hired an attorney to open his estate, have him declared dead, and press her claims for the insurance proceeds.

Defendants jointly engaged a service to perform an exhaustive pre-payment investigation of the insured's disappearance. The investigator testified that he did not have any factual basis to believe that a homicide had occurred, that he had a concern, at the time the body was found, that someone might have killed Mr. Nelson, but that that concern did not rise to the level of what he called a "well-founded suspicion."

Thirteen months after Mr. Nelson's disappearance, in August 1984, his body was found in a creek bed alongside the highway where his abandoned car had previously been discovered. The coroner's office found that the crushed skull and condition of the body were consistent with accidental drowning. The sheriff's office concurred with this assessment and issued a final report indicating that there was no suspicion of foul play or of criminal activity with regard to Mr. Nelson's death.

Based upon the official findings as to cause of death, defendants paid the proceeds of the life insurance policies to the policies' designated beneficiaries. In October 1984, Sharon Nelson was paid $100,000 plus interest as the

---

* Sitting by assignment of the Chief Justice under provisions of the Colo. Const. art. VI, Sec. 5(3), and § 24-51-1105, C.R.S. (1988 Repl.Vol. 10B).

primary beneficiary of the NALAC policy. In February 1985, at the conclusion of an interpleader action, Sharon Nelson, as trustee of the Nelson Family Trust–A, and the Trinidad National Bank, as assignee, received the proceeds of the Western States insurance policy in the face amount of $100,000 plus interest.

Years later, in 1988, under questioning in connection with the murder of her then current husband, Sharon Nelson admitted Perry Nelson had been murdered at her insistence by her boyfriend. She pleaded guilty to first degree murder of Mr. Nelson on June 7, 1989.

This action was brought by plaintiffs, all natural children of Mr. Nelson, to recover the proceeds of the life insurance policies paid to Sharon Nelson. Plaintiffs claimed that because Sharon Nelson had murdered their father, they, as contingent beneficiaries to the policies, were entitled to the proceeds under Colorado's "slayer statute," § 15–11–803, C.R.S. (1987 Repl.Vol. 6B). Specifically, under the Western States policy, the contingent beneficiary of the Nelson Family Trust–A was the estate of the insured, and the contingent beneficiaries under the NALAC policy were the "Children, Perry E. Nelson, III and Brooke Erin Nelson," if both parents were deceased.

Plaintiffs' claim for bad faith breach of insurance contract was dismissed, and the case proceeded to a jury trial on plaintiffs' remaining claims for breach of contract, negligence, and exemplary damages. The jury found that defendants were negligent, and judgment was entered on the jury awards of damages in the total amount of $200,000, the face amount of both policies, plus interest from the date of the insured's death. These appeals followed.

## I.

Defendants contend that the trial court erred in declining to rule that plaintiffs' claims to the insurance proceeds are barred pursuant to the notice provision of Colorado's "slayer statute," § 15–11–803(6), C.R.S. (1987 Repl.Vol. 6B). They argue that the effect of the statute's notice provision is to relieve

them of liability whenever notice of a competing claim has not been received prior to payment. We agree and conclude that § 15–11–803(6) absolves defendants of any liability to plaintiffs here.

■ The Colorado slayer statute was first enacted in 1923. Prior to its adoption, the common law in Colorado did not preclude a murderer from inheriting the victim's property. *Smith v. Greenburg*, 121 Colo. 417, 218 P.2d 514 (1950).

Historically, Colorado has strictly construed the slayer statute and enforced it as written. At the time that *Smith, supra*, was decided, the slayer statute required a conviction before a murderer would be disqualified from inheriting. Thus, in *Smith*, our supreme court held that the killer there could inherit from his victim because he had not been convicted of murder.

In a similar vein, in *Strickland v. Wysowatcky*, 128 Colo. 221, 250 P.2d 199 (1952), the supreme court refused to engraft upon the slayer statute an exception which it did not contain. The issue in *Strickland* was whether a husband was disqualified from inheriting insurance proceeds from his wife's estate as a result of his pleading guilty to a charge of voluntary manslaughter in connection with her death. Since the statute in effect at that time did not preclude a person who was convicted of manslaughter, as opposed to convictions for first or second degree murder from recovering insurance proceeds or inheriting from the decedent, the husband was permitted to receive the policy proceeds. The court recognized that the General Assembly had preempted the field and displaced the common law. As a result, the court stated that "[a] statutory right cannot be defeated by the application of a common-law principle."

When this court decided *Seidlitz v. Eames*, 753 P.2d 775 (Colo.App.1987), the slayer statute was in effect in its present form. At that time, the statute provided (and still provides) that a named beneficiary of an insurance contract who is convicted of, pleads guilty to, enters a plea of nolo contendere to, or is found by a preponderance of the evidence in a civil action as having committed first or second degree murder or manslaughter is

not entitled to any benefit under the policy. In *Seidlitz*, the murderer's children were the contingent beneficiaries of the policy. The plaintiff argued that, on the grounds of public policy, the children of the murderer should not recover the proceeds of the insurance policies as this would result in a "benefit" to the murderer. Relying on precedent, this court strictly construed the slayer statute, refused to rewrite or ignore its provisions, and held for the children. *See also People v. McCormick*, 784 P.2d 808 (Colo.App.1989).

■ The last sentence of § 15–11–803(6) of the slayer statute (the notice provision) provides:

> Any insurance company, bank, or other obligor making payment according to the terms of its policy or obligation is not liable by reason of this section unless prior to payment it has received at its home office or principal address written notice of a claim under this section.

Prior to this case, no Colorado appellate court has addressed this notice provision. However, other jurisdictions which have considered a notice requirement similar to the one at issue here have held that if, as here, the insurers have performed their contracts according to their terms and in accord with the notice provision of the statute, they are "exonerated from further liability thereon and that [plaintiffs], having failed to give timely notice of [their] claim[s] to [insurers], must be relegated to [their] remedy against the named beneficiary who received the proceeds." *Miller v. Paul Revere Life Insurance Co.*, 81 Wash.2d 302, 501 P.2d 1063 (1972). To the same effect, *see Rogers v. Union Mutual Stock Life Insurance Co.*, 782 F.2d 1214 (4th Cir.1986) and *Leonard v. Occidental Life Insurance Co.*, 31 Cal.App.3d 117, 106 Cal.Rptr. 899 (1973).

The language of the notice provision is clear and unambiguous. Therefore, it is not subject to interpretation and must be enforced and applied as written. The death benefits were properly paid in accordance with the terms of the insurance policies. The notice provision requires that defendants be relieved from liability to the plaintiffs, as defendants did not receive written notice, or any notice, of a competing claim prior to payment of the proceeds to the named beneficiary of the policies.

## II.

In view of our resolution of this issue, it is unnecessary to address defendants' other contentions for reversal or the contentions of plaintiffs on their cross-appeal.

The judgment is reversed, and the cause is remanded for the entry of judgment in defendants' favor and for further proceedings on the issue of costs.

MARQUEZ, J., concurs.

JONES, J., dissents.

JUDGE JONES dissenting.

The purpose of the Colorado "slayer" statute is plainly to deny to one who kills an insured the benefits which accrue from an insurance policy on the decedent's life. Section 15–11–803(1), C.R.S. (1987 Repl.Vol. 6B). For the statute to be applicable, the policy beneficiary must plead guilty or be convicted of the killing in a criminal case or must be shown to be the killer by a preponderance of the evidence in a civil case. *See* § 15–11–803(5), C.R.S. (1987 Repl.Vol. 6B); *Smith v. Greenburg*, 121 Colo. 417, 218 P.2d 514 (1950) (construing predecessor statute as inapplicable in the absence of murder conviction).

The statute lends itself to easy applicability in the general case in which the principal beneficiary of an insurance policy has obviously killed the insured, and this fact is known prior to payment of the policy proceeds. It is with this kind of assured ease that the majority resolves this case.

However, this case is not the general one. For here, in spite of a ten-month investigation during which nearly 600 pages of interviews and reports were amassed, documenting numerous contradictions in Sharon Nelson's version of events surrounding the disappearance of the insured, and in spite of the investigator's suspicions that the insured was murdered, Sharon Nelson, who later confessed to the killing, was neither charged with or convicted of the murder when she was paid the proceeds from the insurance policy.

Under these unique circumstances, I conclude that neither the notice nor general provisions of the statute are applicable and that the trial court rulings are consistent with pertinent common law principles. Hence, I would affirm the judgment.

### I.

I disagree with defendants' contention that the trial court erred in declining to rule that plaintiffs' claims to the insurance proceeds are barred by operation of the slayer statute notice provision which absolves an insurer of liability for paying insurance proceeds to the killer of its insured unless it receives notice of a competing claim.

Typically, the payment of insurance proceeds is governed by the insurance contract. However, when a designated beneficiary has killed the insured, the Colorado Probate Code, § 15–11–803, C.R.S. (1987 Repl.Vol. 6B), referred to as the "slayer statute," governs the distribution of insurance proceeds. Under the statute, a designated beneficiary of an insurance contract who is convicted of, pleads guilty to, enters a plea of nolo contendere to, or is found by a preponderance of the evidence in a civil action as having committed first or second degree murder or manslaughter, is barred from collecting any of the proceeds resulting from the victim's death, including insurance proceeds. Sections 15–11–803(1) and (5), C.R.S. (1987 Repl. Vol. 6B); *Bernstein v. Rosenthal,* 671 P.2d 979 (Colo.App.1983). *See Smith v. Greenburg, supra* (applying the similar predecessor statute).

The slayer statute also includes a notice provision which provides, in relevant part, as follows:

> Any insurance company, bank, or other obligor making payment according to the terms of its policy or obligation is not liable by *reason of this section* unless prior to payment it has received at its home office or principal address written notice of a claim *under this section.*

Section 15–11–803(6), C.R.S. (1987 Repl.Vol. 6B) (emphasis added).

Defendants argue that the notice provision was triggered when they made payment to Sharon Nelson according to the terms of their insurance policies and that, pursuant to this provision, plaintiffs' failure to provide notice of their "competing" claims prior to payment precludes their further liability for payment. This is a correct interpretation of the notice provision whenever the general provisions of the slayer statute have been triggered, but it does not apply to the circumstances here.

It is presumed that an entire statute is meant to be effective, § 2–4–201(1)(b), C.R.S. (1980 Repl.Vol. 1B), and, as previously observed, the general provisions of the statute are not triggered until the designated beneficiary has either been convicted of, pleads guilty to, enters a plea of nolo contendere, or is found by a preponderance of the evidence in a civil action as having committed first or second degree murder or manslaughter. *See Strickland v. Wysowatcky,* 128 Colo. 221, 250 P.2d 199 (1952); *Smith v. Greenburg, supra; Bernstein v. Rosenthal, supra.* Thus, absent one of these specified findings in a judicial proceeding, the provisions of the slayer statute are not triggered and the notice provision cannot be operative.

Here, the finding of guilt, conviction, or commission of murder necessary to trigger the slayer statute was not, and could not have been, present when defendants paid the designated beneficiary of the insurance policy. Thus, I would conclude that neither the general provisions of the slayer statute nor the notice provision was operative, and defendants are not relieved of liability for payment by operation of § 15–11–803(6). *See Shrader v. Equitable Life Assurance Society,* 20 Ohio St.3d 41, 485 N.E.2d 1031 (Ohio 1985).

Accordingly, I disagree with the majority that the trial court erred in declining to rule that plaintiff's claims to the insurance proceeds are barred pursuant to the notice provisions of the slayer statute.

### II.

I further disagree with defendants' assertion that the trial court erred in allowing the jury to determine whether they had acted negligently in paying the designated benefi-

ciary according to the terms of their insurance policies.

A number of jurisdictions that have enacted "slayer" statutes similar to Colorado's have interpreted them as extensions of the common law rule that no person should benefit from his or her own wrongful conduct. Hence, it has been held that judicial application of this common law rule may be appropriate when the statutory provisions have not been triggered. *See Harper v. Prudential Insurance Co.,* 233 Kan. 358, 662 P.2d 1264 (1983); *Shrader v. Equitable Life Assurance Society, supra; State Mutual Life Assurance Co. v. Hampton,* 696 P.2d 1027 (Okl.1985). This common law principle has been recognized in Colorado. *See In re Estate of Walker,* 847 P.2d 162 (Colo.App.1992); *Bernstein v. Rosenthal, supra* (one who has brought about the death of another may not benefit from that conduct).

I would adopt this view, and, applying this principle here, when the provisions of the slayer statute had not yet been triggered, I conclude that defendants' actions are governed by common law principles that would have been supplanted by the statute had it been triggered. *See* § 15–10–103, C.R.S. (1987 Repl.Vol. 6B) (unless displaced by the particular provisions of the Colorado Probate Code, the principles of law and equity supplement its provisions).

Specifically, the question here is whether, given their knowledge of facts that could foreseeably result in the policy beneficiary benefiting from her own wrongful conduct, defendants had an independent common law duty to act in good faith in paying their beneficiary's claim, rather than merely interpleading the policy proceeds.

Here, in ruling that it was a question of fact as to whether defendants acted negligently in paying the proceeds of their policies to the designated beneficiary under the facts and circumstances known to them, the trial court relied upon the common law principles set forth in the aforementioned cases. I conclude that the trial court acted properly in doing so. Accordingly, I would hold that it did not err in allowing the jury to determine whether defendants had acted negligently in reliance upon these principles.

## III.

Defendants further contend that the trial court erred in ruling that their knowledge of the suspicious circumstances surrounding the death of their insured and the policies' beneficiary gave rise to a duty to interplead the policy proceeds into the court in order to afford them protection from liability for double payment. I perceive no error by the trial court in this regard.

In my view, when, as here, a slayer statute has not yet been triggered by the guilt or conviction of a designated beneficiary, common law principles of negligence may supplant the statutory provisions. *See* § 15–10–103, C.R.S. (1987 Repl.Vol. 6B); *Harper v. Prudential Insurance Co., supra.* Hence, the notice provision of the slayer statute would not affect an insurer's institution of an interpleader action.

An independent duty to act in good faith in paying a beneficiary's claim was recognized in *Weed v. Equitable Life Assurance Society,* 288 F.2d 463 (5th Cir.1961), *cert. denied,* 368 U.S. 821, 82 S.Ct. 40, 7 L.Ed.2d 27 (1961), wherein the liability of an insurance company for payment to a contingent beneficiary was held to be governed by the rule that payment in good faith to a beneficiary of record by an insurance company without knowledge of facts vitiating the claim will prevent a second recovery by another claimant.

This principle was applied in *Harper v. Prudential Insurance Co., supra,* wherein the court recognized an insurer's duty of good faith to conduct a pre-payment investigation when the insurer was aware of suspicious circumstances involving the designated beneficiary and the death of the insured. The court held that an insurer may be held liable for payments to a beneficiary when it had notice and knowledge of facts which might have defeated the beneficiary's claim and it nevertheless made such payments without bringing an interpleader action so as to afford the contingent beneficiary or the insured's estate an opportunity to protect its interest.

In reaching its holding, the *Harper* court relied upon *Glass v. United States,* 506 F.2d

379 (10th Cir.1974). In *Glass*, the U.S. Court of Appeals for the Tenth Circuit concluded that a government insurer had "negligently and erroneously paid the entire proceeds" of a life insurance policy to a beneficiary whom it knew had been indicted for the murder of its insured. *Glass v. United States, supra*, at 382. In so holding, the court relied on the fact that the insurer could have filed an interpleader action, "which is specifically designed for these cases," and which would have afforded the contingent beneficiaries an opportunity to voice their objection to payment of the primary beneficiary. *Glass v. United States, supra*, at 383. *See also McDuffie v. Aetna Life Insurance Co.*, 160 F.Supp. 541 (E.D.Mich.1957) (insurer had notice that there was sufficient cloud on beneficiary's right to policy proceeds to give rise to claim of contingent beneficiary, and insurer could have protected itself by statutory interpleader proceeding).

Additionally, several jurisdictions have recognized the duty to act in good faith in paying a beneficiary's claim as, in some circumstances, including an obligation to interplead insurance policy proceeds even absent an indictment or conviction of the primary beneficiary because it may still be established, in a civil proceeding, that the beneficiary has feloniously caused the death of the insured, thereby barring the beneficiary from collecting the insurance proceeds. *See McDuffie v. Aetna Life Insurance Co., supra; Shrader v. Equitable Life Assurance Society, supra; Harper v. Prudential Insurance Co., supra; United Farm Bureau Family Life Insurance Co. v. Fultz*, 176 Ind.App. 217, 375 N.E.2d 601 (1978).

Whether an insurer has breached its duty to act in good faith in paying the proceeds of an insurance policy without conducting a prepayment investigation when the insurer was aware of suspicious circumstances concerning the beneficiary and the death of the insured is a question of fact. *In re Estate of Thompson*, 99 Ill.App.3d 303, 55 Ill.Dec. 217, 426 N.E.2d 1 (1981). Likewise, I would conclude that whether an insurer has breached its duty to act in good faith in paying the proceeds of an insurance policy without instituting an interpleader action is a question for the jury.

Accordingly, I would hold that the trial court did not err in ruling that defendants' knowledge of the suspicious circumstances surrounding the death of their policies' beneficiary gave rise to a duty to interplead the policy proceeds into the court to afford them protection from double liability for payment of the proceeds.

## IV.

Defendants raise certain procedural issues on appeal which I would also resolve in favor of plaintiffs.

## A.

As to defendants' contention that the trial court erred in instructing the jury as to the notice requirements of the slayer statute, while I do not agree with plaintiffs assertion that the instruction was a correct statement of the law, I perceive no reversible error.

The trial court's instruction to the jurors regarding the slayer statute sets forth the language of § 15–11–803(6) and provides, in relevant part, as follows:

The notice requirements of this statute are not absolute. An insurance company under this statute cannot avoid liability simply because a beneficiary failed to provide written notice, if, under all circumstances, the beneficiaries were reasonable in failing to give notice.

Because the notice provision of the slayer statute was not triggered here, the trial court properly should have instructed the jurors as to the parties' obligations under the common law. However, in instructing the jurors that the notice provisions are not absolute, the trial court essentially allowed the jurors to disregard the notice provision, thereby allowing them appropriately to consider the common law negligence principles operational here and as to which the jurors were instructed.

Accordingly, I would conclude that the trial court's error in instructing the jurors in this regard did not affect a substantial right of defendants and does not, therefore, rise to

the level of reversible error. *See* C.R.C.P. 61.

## B.

Defendants also contend that the trial court erred in refusing to instruct the jury as to the definition of a term employed in a statute submitted for the jurors' consideration. Plaintiffs respond that defendants' tendered instruction was an incorrect statement of the law and that the trial court, therefore, did not err in rejecting the tendered instruction. I agree with plaintiffs.

The trial court instructed the jury regarding the duty to report a crime pursuant to § 18–8–115, C.R.S. (1986 Repl.Vol. 8B) by reproducing the statute for the jurors' consideration. Defendants tendered an instruction for the purpose of defining "reasonable grounds," as incorporated in the statute, as follows:

> It is the duty of every corporation or person who has *reasonable grounds* to believe that a crime has been committed to report promptly the suspected crime to law enforcement authorities. (emphasis added)

Defendants' tendered instruction equated the legal definition of "reasonable grounds" with the definition of probable cause to arrest, as defined in *People v. Nanes,* 174 Colo. 294, 483 P.2d 958 (1971). "Probable cause" is not the legal equivalent of "reasonable grounds." *See, e.g., People v. Rahming,* 795 P.2d 1338 (Colo.1990) (reasonable suspicion to conduct investigative stop lesser standard than probable cause to arrest).

Thus, because defendant's tendered instruction contained an incorrect statement of law, the trial court did not err in refusing to present it to the jury.

## C.

Finally, I perceive no reversible error as to defendants' contention that the trial court erred in denying their motion for a new trial because of statements made by plaintiffs' counsel regarding defendants' assets.

During cross-examination, plaintiffs' counsel asked the witness whether one of the defendants had "approximately a billion dollars of assets in 1984." Defense counsel immediately objected and moved for a mistrial on the grounds that § 13–21–102(6), C.R.S. (1987 Repl.Vol. 6A) precludes the introduction of evidence of a defendant's financial status in any civil action in which exemplary damages may be awarded.

Recognizing the potential of the question "for significant prejudicial effect," the trial court, nevertheless, denied the motion for mistrial, but ruled that it would instruct the jury that it is not permitted to reach a verdict based on sympathy or prejudice. Also, upon the jurors' return to the courtroom, the trial court instructed them to disregard both the question and answer and that evidence of income or net worth of a party are not to be considered in determining the appropriateness or amount of damages.

In ruling on a motion for mistrial engendered by counsel's improper statement, a court has discretion to consider the context in which the statement was made and whether it involved an appeal to passion or prejudice. *Celebrities Bowling, Inc. v. Shattuck,* 160 Colo. 102, 414 P.2d 657 (1966). Hence, this court may consider whether the statement was made more than once and whether the trial court issued an immediate curative instruction which ameliorated the statement's damage. *See Vigil v. Industrial Claim Appeals Office,* 841 P.2d 335 (Colo.App.1992).

Here, the objectionable language was part of a leading question during cross-examination. The witness did not respond, and the trial court immediately instructed the jury to disregard the statement and also later explained why the statement should be disregarded. Moreover, the statement was not made in the course of an inflammatory argument such as would adduce passion or prejudice, *see National Surety Co. v. Morlan,* 91 Colo. 164, 13 P.2d 260 (1932), and the jury did not award any exemplary damages. *See* § 13–21–102(6), C.R.S. (1987 Repl.Vol. 6A). Thus, I would conclude that the defendants were not prejudiced by the language of the leading question.

Given these circumstances, and the context in which the language by counsel was used, I would conclude that the trial court did not

abuse its discretion in not declaring a mistrial.

Accordingly, I would affirm the judgment of the trial court. Such affirmance would render plaintiffs' cross-appeal moot.