Tammi LUNSFORD, Lori Hustwaite, Kathy Webster, Perry Edson Nelson, III, a minor, and Brooke Erin Nelson, a minor, by and through their legal guardian ad litem, Ellen Trujillo, Petitioners,

v.

WESTERN STATES LIFE INSURANCE and North American Life & Casualty Company, Respondents.

No. 93SC764.

Supreme Court of Colorado, En Banc.

Dec. 4, 1995.

Rehearing Denied Jan. 16, 1996.

Haddon, Morgan & Foreman, P.C., Harold A. Haddon, Rachel A. Bellis, Denver, Haines & Olsen, P.C., Susan Haines, Spencer J. Crona, Denver, for Petitioners.

Phelps, Singer & Dunn, Alan Gary Dunn, Joan M. Riordan, Denver, for Respondents.

Justice LOHR delivered the Opinion of the Court.

This case concerns the scope of protection provided by Colorado's "slayer statute" to insurance companies that paid life insurance policy proceeds to a primary beneficiary who

was later determined to have murdered the insured, where the insurers did not receive written notice of competing claims from the contingent beneficiaries prior to disbursement. *See* § 15–11–803, 6B C.R.S. (1987) ("slayer statute"). The plaintiff contingent beneficiaries obtained a judgment for damages against the defendant insurers based on a jury determination that the insurers acted negligently in paying the policy proceeds to the primary beneficiary. The Colorado Court of Appeals reversed and held that where payment is made according to the terms of an insurance policy and in the absence of written notice of contingent beneficiaries' claims, section 15–11–803(6) protects an insurer from liability for disbursing policy proceeds to one who is later determined to be guilty of murdering the insured. *Lundsford v. Western States Life Ins.*, 872 P.2d 1308, 1311 (Colo.App.1993).[1] We granted certiorari to review the court of appeals' resolution of this issue and now reverse and remand to that court for further proceedings.

## I.

During the first half of 1983, Perry Nelson and his wife, Sharon Nelson, purchased several policies that provided over $200,000 in life insurance coverage to Mr. Nelson. Two of the policies were issued by defendants Western States Life Insurance Company and North American Life and Casualty Company.[2] Mr. Nelson designated Sharon Nelson as the primary beneficiary in the North American Life and Casualty Company policy, and the Nelson's minor children as the contingent beneficiaries. The primary beneficiary in the Western States Life Insurance Company policy was designated as the "Nelson Family Trust—A," of which Sharon Nelson was the trustee, and the contingent bene-

ficiary was designated as Mr. Nelson's estate.

On July 22, 1983, Mr. Nelson, an optometrist from Trinidad, Colorado, traveled to Denver to update his optometry certificate. He disappeared, and the next day law enforcement officers discovered his partially stripped and empty vehicle in the waters of Clear Creek. When investigating officers recovered the vehicle, they did not find Mr. Nelson's body. Without a recovered body or other conclusive evidence of Mr. Nelson's death, but upon petition by Sharon Nelson, on February 18, 1984, the Las Animas County District Court issued an order declaring that Mr. Nelson had died on July 23, 1983.

Meanwhile, Mr. Nelson's life insurers retained Equifax Services, Inc. ("Equifax") to conduct an investigation into the circumstances surrounding Mr. Nelson's disappearance. On August 12, 1984, Mr. Nelson's body was found on a sandbar in Clear Creek. The sheriff's office closed the case after concluding in a final report that the available evidence indicated that Mr. Nelson died as the result of a traffic accident. In the course of an extensive investigation culminating in a 600–page report, the Equifax investigator developed concerns of foul play centering on Sharon Nelson but nonetheless determined that he did not have the "well-founded suspicion" necessary to warrant a delay in disbursing the insurance proceeds. As a result, the insurers paid the policy proceeds to Sharon Nelson.[3]

Several years later, Sharon Nelson admitted her complicity in Mr. Nelson's murder during an unrelated investigation. On June 7, 1989, Sharon Nelson pled guilty to the murder of Mr. Nelson and received a sentence of life imprisonment. On July 19, 1989,

---

1. The name of the first-designated plaintiff, Tammi "Lunsford," is incorrectly spelled "Lundsford" in the caption of the reported decision. *Lundsford v. Western States Life Ins.*, 872 P.2d 1308 (Colo.App.1993). For this reason, we adopt *"Western States Life"* as our short reference to the case in this opinion.

2. A third policy was issued by another insurance company that was originally named as a defendant but which settled its dispute and was dismissed from the case prior to trial.

3. The insurers did not receive notice of competing claims from the contingent beneficiaries prior to disbursement. The insurers, however, did not notify the contingent beneficiaries of the existence of the policies or of their designations as contingent beneficiaries. The evidence at trial was that the contingent beneficiaries were unaware of the existence of the insurance policies and that the adult beneficiaries were actively misled by Sharon Nelson to believe that no such policies existed.

Mr. Nelson's children filed a complaint against the insurers in Denver District Court,[4] claiming negligence and breach of contract. In their initial complaint, the children alleged that the insurers paid life insurance benefits contrary to section 15–11–803(3), which generally provides that a beneficiary who murders an insured is prohibited from receiving an insured's policy proceeds and is treated as predeceasing the insured. The insurers offered several affirmative defenses, including the contention that section 15–11–803(3) was inapplicable because of the plaintiffs' failure to give written notice of competing claims as required by section 15–11–803(6). The insurers moved for summary judgment, maintaining that section 15–11–803(6) barred the plaintiffs' claims.

The district court denied summary judgment, holding that section 15–11–803(6) does not protect an insurer that negligently disburses policy proceeds to a primary beneficiary in the face of suspicious circumstances surrounding the death of an insured. In denying the insurers' summary judgment motion, the court ruled that the notice provision of section 15–11–803(6) was not an "absolute defense," that the "bottom line" was whether the insurers "acted in a reasonably prudent manner," and that the negligence issue required determination of factual questions. After denying the motion for sum-

mary judgment, the trial court granted the plaintiffs leave to amend their complaint. The amended complaint added claims of bad faith breach of insurance contract and punitive damages.

The insurers responded by filing a motion to dismiss the negligence, bad faith breach of insurance contract, and punitive damages claims. A different judge now presided, and that judge granted the motion to dismiss only as to the bad faith breach claim.[5] The judge declined to revisit the earlier ruling regarding the scope of section 15–11–803(6) both in resolving the motion to dismiss the negligence claim and in settling jury instructions. Instead, that judge also concluded that the notice requirements of section 15–11–803(6) "are not absolute" and that the insurers' actions should be judged on a reasonableness standard.[6] The jury found that the insurers acted negligently in disbursing the proceeds and awarded the plaintiffs $200,000 plus interest.[7]

The Colorado Court of Appeals reversed, with one member of the three-judge panel dissenting. The court held that the notice provision of section 15–11–803(6) precluded insurer liability in this case. *Western States Life*, 872 P.2d at 1311. We granted certiorari to review that holding,[8] and now reverse

4. The plaintiffs include three children of Mr. Nelson from a former marriage and two children from the marriage of Perry and Sharon Nelson.

5. The plaintiffs conditionally cross-appealed dismissal of the bad faith breach of insurance contract claim. The court of appeals did not find it necessary to address the issue, and it is not before us on certiorari review.

6. Specifically, the judge presented the jury with both a standard negligence instruction, and an instruction outlining the § 15–11–803(6) defense with a caveat that the statutory bar was not an absolute defense.

7. The jury rejected the punitive damages claim. The jury instruction regarding punitive damages required a definitive finding by the jury that the injury complained of was attended by "willful and wanton conduct" before any exemplary damages award could be granted. The jury found that willful and wanton conduct had not been established, and awarded the plaintiffs no punitive damages as a result.

8. We granted certiorari on the following question, as reframed by this court:

Did the Court of Appeals err in holding that under the notice requirements of the state slayer statute, petitioner children's failure to provide written notice of a claim, prior to the time the respondent insurance companies paid the proceeds to the primary beneficiary of the life insurance contract, relieved the insurance companies of liability.

On appeal, the insurers did not challenge the sufficiency of the evidence to support the jury's determination of negligence. The Equifax report contains extensive but highly inconclusive information supporting its investigator's concern that Perry Nelson's death was the result of foul play and casting suspicion on Sharon Nelson. Equifax did not disclose this information to the Jefferson County Sheriff's Office, which investigated Mr. Nelson's death, before the sheriff's office closed the case based on the conclusion that the death was accidental. A deputy sheriff with thirty-two years experience, who headed homicide investigations for the sheriff's office at the time Mr. Nelson's body was discovered, testified that

based on our determinations that the statute is inapplicable and that the common law supports the judgment of the district court.

## II.

■ The General Assembly has enacted legislation embodying the principle that killers should not reap profits from the perpetration of homicides. Section 15–11–803 prevents such a result in several specific contexts. *See* § 15–11–803, 6B C.R.S. (1987). Subsection (3) of that statute relates to the payment of life insurance policy proceeds and is relevant to the present case:

> A named beneficiary of a bond, life insurance policy, or other contractual arrangement who kills the principal obligee or the person upon whose life the policy is issued and, as a result thereof, is convicted of, pleads guilty to, or enters a plea of nolo contendere to the crime of murder in the first or second degree or manslaughter, as said crimes are defined in sections 18–3–102 to 18–3–104, C.R.S., is not entitled to any benefit under the bond, policy, or other contractual arrangement, and it becomes payable as though the killer had predeceased the decedent.

§ 15–11–803(3), 6B C.R.S. (1987).

On its face, section 15–11–803(3) prevents an individual from receiving a victim's life insurance proceeds if that individual is convicted of, pleads guilty to, or enters a plea of nolo contendere to one of the specified homicide offenses.[9] In such circumstances, guilt is established by trial or by judgment entered on the individual's own plea, providing

reliable evidence of criminal culpability. The statute is silent regarding a beneficiary's entitlement to insurance proceeds in other situations.

Section 15–11–803(6) offers protection to insurers that pay beneficiaries in accordance with the terms of their policies and without notice from contingent beneficiaries who may have become entitled to the insurance proceeds by reason of other subsections of section 15–11–803. Section 15–11–803(6) provides in pertinent part:

> Any insurance company, bank, or other obligor making payment according to the terms of its policy or obligation is not liable *by reason of this section* unless prior to payment it has received at its home office or principal address written notice of a claim *under this section.*

§ 15–11–803(6), 6B C.R.S. (1987) (emphasis added). The protection offered by subsection (6) is limited to situations where the insurance company would be obligated under section 15–11–803(3) to make payment "as though the killer had predeceased the decedent." *Id.* Those situations, in turn, are restricted to ones in which the killer has been convicted of, or has pled guilty or nolo contendere to, murder or manslaughter of the insured.[10] Although there is no helpful legislative history, one can infer that the legislature deemed that a reliably established homicide would come to the attention of any contingent beneficiaries, who should then bear the burden of giving written notice of claim to the insurers.

the Equifax information would have been vital to the investigation had Equifax provided that information to the sheriff's office:

Q. Had you known that the insurance companies had gathered all of that kind of information, do you believe your department would have closed this investigation as an accidental death?

A. No, sir. I can almost guarantee you they would not have.

**9.** Section 15–11–803(5) further provides:

Notwithstanding an acquittal or dismissal, if a court of competent [civil] jurisdiction finds by a preponderance of the evidence that a surviving spouse commits murder in the first or second degree or manslaughter ... such sur-

viving spouse is not entitled to any benefits under the will or under this article, and the estate of the deceased spouse passes as if the killer had predeceased the decedent.

§ 15–11–803(5), 6B C.R.S. (1987). Since Sharon Nelson's complicity in the murder of her husband had not been established in civil proceedings at the time the insurers disbursed Mr. Nelson's insurance proceeds, that statute is inapplicable to the present case.

**10.** As previously noted, *supra* note 9, the disentitlement of perpetrators and attendant protection of insurers also extends to situations where a surviving spouse has been civilly determined to be guilty of murder or manslaughter of his or her spouse. § 15–11–803(5), 6B C.R.S. (1987). That situation is not presented by this case.

In the absence of a notice of claim under subsection (6), insurers are protected in disbursing payments according to policy terms even though the paid beneficiaries are disentitled to such disbursements by reason of their complicity in the homicide of the insured as established by conviction or plea. This legislative scheme allocates to contingent beneficiaries the risk of loss of benefits where the primary beneficiary's guilt has been reliably established and the insurer has not received written notice of any claims by contingent beneficiaries. Subsection (3) also establishes the point at which an insurer can pay policy proceeds to contingent beneficiaries without risk of liability to a primary beneficiary whom the insurer suspected of the murder or manslaughter of the insured but whose guilt had not been reliably established earlier.

The statutory scheme is limited to disentitlement of named beneficiaries who have been established as perpetrators of specified homicides by the means set forth in section 15–11–803(3).[11] Likewise, the protection for insurers under section 15–11–803(6) is limited to situations where the primary beneficiary has been convicted of, or has pled guilty or nolo contendere to, such a homicide.[12]

■ However, section 15–11–803 does not address the issue in this case, in which payment was made before the primary beneficiary's guilt was established by trial or plea. Section 15–11–803(3) is restricted to circumstances where the guilt of a beneficiary is reliably established *prior* to an insurer's payment of policy proceeds, evidenced by the explicit statutory directive that in section 15–11–803(3) situations an insurance policy "*becomes payable* as though the killer had predeceased the decedent." § 15–11–803(3), 6B C.R.S. (1987) (emphasis added). Where the language of a statute is clear on its face, we must apply it as written. *E.g., Van Waters & Rogers, Inc. v. Keelan,* 840 P.2d 1070, 1076 (Colo.1992). Furthermore, when the legislature speaks with exactitude, we must construe the statute to mean that the inclusion or specification of a particular set of conditions necessarily excludes others. *See, e.g., Reale v. Board of Real Estate Appraisers,* 880 P.2d 1205, 1207 (Colo.1994); *Vela v. District Court,* 664 P.2d 243, 244 (Colo.1983); *Quintrall v. Goldsmith,* 134 Colo. 410, 411, 306 P.2d 246, 251 (1957); *McNichols v. Police Ass'n,* 121 Colo. 45, 61, 215 P.2d 303, 311 (1949). Here, the legislature plainly restricted section 15–11–803(3) to situations where a beneficiary was convicted of, or pled guilty or nolo contendere to, the murder or manslaughter of the policy holder before receiving insurance proceeds as a beneficiary.

■ Our decision that section 15–11–803 does not apply to this case is also supported by analogous precedent. The slayer statute must be strictly construed, and exceptions to the literal language cannot be superimposed. *Smith v. Greenburg,* 121 Colo. 417, 423, 218 P.2d 514, 517–518 (1950) ("'[S]uch a statute *must be strictly construed.... A statute disqualifying one who has been convicted of the murder of deceased does not apply in the absence of such conviction.*'" (quoting 26 C.J.S. *Descent and Distribution* § 47, at 1055) (emphasis in opinion)); *Strickland v. Wysowatcky,* 128 Colo. 221, 250 P.2d 199, 201 (1952) (although convicted murderers cannot inherit from their victims according to statute, that statute must be narrowly construed and therefore does not prevent those convicted of manslaughter from so inheriting); *People v. McCormick,* 784 P.2d 808, 810 (Colo. App.1989) (convicted murderers cannot inherit from their victims pursuant to section 15–11–803(1), although the statute is limited by its terms and therefore cannot prevent inheritance by a complicitor who was never convicted because of a grant of immunity); *see also Seidlitz v. Eames,* 753 P.2d 775, 776–77 (Colo.App.1987) (strictly construing section 15–11–803(3) and interpreting a life insurance policy).

Neither section 15–11–803(6) nor section 15–11–803(3) applies where the guilt of the primary beneficiary to one of the crimes specified in section 15–11–803(3) has not been

---

11. *But see supra* note 9.

12. Since the time that this case began, the General Assembly amended section 15–11–803 to

afford insurers greater protection from liability. *See* § 15–11–803(8), 6B C.R.S. (1995 Supp.).

formally established by plea or conviction as envisioned in that section. In order to determine the merit of the claims asserted by the contingent beneficiaries, it therefore is necessary to identify the standards by which insurer conduct is governed when the circumstances surrounding an insured's death cast suspicion on the primary beneficiary, but where there has been no conviction or formal plea of guilty or nolo contendere by that beneficiary when the insurer disburses life insurance proceeds.

## III.

The General Assembly provided guidance in determining the legal standards that apply to situations not covered by the statutory scheme of the Colorado Probate Code,[13] in which section 15–11–803 appears. Section 15–10–103 provides that "[u]nless displaced by the particular provisions of this [probate] code, the principles of law and equity supplement its provisions." § 15–10–103, 6B C.R.S. (1987). In the absence of an applicable statutory provision setting the standard with which an insurer must comply before making payment to a beneficiary in situations such as the one this court confronts today, we look to principles of common law and equity for guidance.

■ Faced with the inapplicability of section 15–11–803, this court must determine the legitimacy of the district court's application of a negligence standard to the insurers' actions.[14] We find support for the district court standard in two areas of the common law, the first specifically regarding killers' entitlements to their victims' life insurance proceeds and the second treating generally the standards governing the conduct of insurers in disbursing insurance policy proceeds.

■ First, we have recognized that in the absence of an applicable statute, a killer cannot receive the proceeds of a victim's life insurance policy. In *Smith v. Greenburg,*

the parties stipulated, consistent with the trial court's judgment, that the law was "fairly well settled that where the beneficiary named in a life insurance policy causes the death of the named insured, he is barred from taking any of the proceeds." *Smith,* 121 Colo. at 420–21, 218 P.2d at 517. On review, this court quoted that stipulation and "approved" that part of the judgment. *Smith,* 121 Colo. at 420–21, 218 P.2d at 517; *see also Strickland,* 128 Colo. at 223, 225–26, 250 P.2d at 200–01 (distinguishing cases in which wrongdoer was claiming as beneficiary of a life insurance policy). Indeed, as early as 1886, the United States Supreme Court proclaimed that "[i]t would be a reproach to the jurisprudence of this country, if one could recover insurance money payable on the death of a party whose life he had feloniously taken." *Mutual Life Ins. Co. v. Armstrong,* 117 U.S. 591, 600, 6 S.Ct. 877, 881, 29 L.Ed. 997 (1886); *accord, e.g., Continental Bank & Trust Co. v. Maag,* 285 F.2d 558, 560 (10th Cir.1960) (murderer may not recover on the victim's life insurance policy, and the contingent beneficiaries should receive the policy proceeds); *Harper v. Prudential Ins. Co. of America,* 233 Kan. 358, 662 P.2d 1264, 1271 (1983) (where the court notes the "almost universally followed" common law rule that bars the "beneficiary of a life insurance policy who feloniously kills the insured from recovering under the policy whether convicted or not"); *Jones v. All American Life Ins. Co.,* 68 N.C.App. 582, 316 S.E.2d 122, 125 (1984) (common law bars killers from receiving their victims' insurance policy proceeds, regardless of whether the killer stands convicted), *aff'd,* 312 N.C. 725, 325 S.E.2d 237 (1985); *Shrader v. Equitable Life Assurance Soc'y,* 20 Ohio St.3d 41, 485 N.E.2d 1031, 1034–35 (1985) ("the common law bars a beneficiary of a life insurance policy from receiving the proceeds of that policy when the beneficiary intentionally and feloniously caused the death of the insured," regardless of whether the killer was convicted);

---

**13.** The Colorado Probate Code consists of articles 10 to 17 of title 15, 6B C.R.S. (1987 & 1995 Supp.)

**14.** The parties' briefs extend beyond the narrow issue on which we granted certiorari to encom-

pass the applicability of the negligence standard. The record adequately establishes the insurers' objection to the negligence standard applied by the trial court. We therefore elect to address the issue.

*McClure v. McClure,* 184 W.Va. 649, 652–54, 403 S.E.2d 197, 200–01 (1991) (describing the common law as holding that the " '[u]nlawful intentional causation of the death of an insured by the beneficiary named in the insurance policy, whether felonious or not, is the test of the common-law rule barring the beneficiary from the proceeds of the policy' ") (quoting *Metropolitan Life Ins. Co. v. Hill,* 115 W.Va. 515, 177 S.E. 188, 189 (1934)); Annotation, *Killing of Insured By Beneficiary As Affecting Life Insurance or Its Proceeds,* 27 A.L.R.3d § II(A)(3), at 802–07 (1969 & 1994 Supp.); 4 George J. Couch, *Couch Cyclopedia of Insurance Law* § 27:150 (2d rev. ed. 1984).

■ Second, insurers have an obligation to disburse insurance policy proceeds to the proper recipient in a reasonable manner. *See, e.g., Glass v. United States,* 506 F.2d 379, 381–83 (10th Cir.1974); *Harper,* 662 P.2d at 1273–74. If an insurer is on notice of facts suggesting that the primary beneficiary is not entitled to a disbursement of policy proceeds, the insurer has a duty to make a reasonable inquiry and to withhold payment until its suspicion is dispelled. *Glass,* 506 F.2d at 382–83; *Weed v. Equitable Life Assurance Soc'y of U.S.,* 288 F.2d 463, 464 (5th Cir.), *cert. denied,* 368 U.S. 821, 82 S.Ct. 40, 7 L.Ed.2d 27 (1961); *McDuffie v. Aetna Life Ins. Co.,* 160 F.Supp. 541, 544 (E.D.Mich. 1957), *aff'd,* 273 F.2d 609 (6th Cir.1960); *Harper,* 662 P.2d at 1273–74. In such circumstances, an insurer can protect itself by interpleading the policy proceeds. *Overstreet v. Kentucky Cent. Life Ins. Co.,* 950 F.2d 931, 940 (4th Cir.1991); *Glass,* 506 F.2d at 382; *McDuffie,* 160 F.Supp. at 544.

■ The insurers argue that section 15–11–803(6) is a broad liability shield defining their disbursement duties in situations such as these. However, any inquiry into an insurer's disbursement of policy proceeds under suspicious circumstances but where there is no conviction or plea of guilty or nolo contendere is a fact-specific question that is appropriately within the province of a jury. The insurers acknowledge this in their briefs by admitting that insurers cannot disburse proceeds "prematurely," such as when law enforcement is still investigating or a prosecution is pending. *See Harper,* 662 P.2d at 1273–74 ("Reason and justice require that a duty be placed upon the insurance company to wait a reasonable time after the death of the insured to allow the law enforcement agencies to complete their investigation. Certainly if a prosecution is actually commenced, the insurance company should delay payment until the outcome of the prosecution is known."); *see also Glass,* 506 F.2d at 382–83. Clearly, at one extreme, insurers have no license to disburse insurance proceeds immediately during an ongoing investigation or prosecution and before a contingent beneficiary can reasonably be expected to notify an insurer of a claim.

■ However, the obligation of an insurer is not simply to refrain from disbursing policy proceeds prematurely. Whether a policy disbursement is premature is only one element of a broader negligence inquiry. Insurers are obligated to act reasonably when disbursing policy proceeds, and this duty is owed to beneficiaries of the policy in question. For example, in *Harper v. Prudential Ins. Co. of America,* the Kansas Supreme Court noted that an "insurance company is to be relieved from liability only if it paid the proceeds to the primary beneficiary in good faith and *without knowledge of facts which may defeat the primary beneficiary's claim.*" *Harper,* 662 P.2d at 1274 (emphasis in original).[15] Similarly, the United States Court of Appeals for the Tenth Circuit concluded in

---

**15.** Although the court in *Harper* references a good faith standard, it also notes an insurer's obligation to withhold payment of policy proceeds where the insurer has *"knowledge of facts which may defeat the primary beneficiary's claim."* *Harper v. Prudential Ins. Co. of America,* 233 Kan. 358, 662 P.2d 1264, 1274 (1983) (emphasis in original); *see also In re Estate of Thompson,* 99 Ill.App.3d 303, 55 Ill.Dec. 217, 219, 426 N.E.2d 1, 3 (1981) (court notes that "good faith" standard is violated where insurers fail to pursue a *"reasonably* prudent investigation [that] would have uncovered facts which would have defeated the beneficiary's claim" (emphasis added)). This latter qualifier is a restatement of traditional negligence principles that, as ably pointed out by the trial court in *Western States Life,* revolve at base around the reasonableness of disregarding facts that suggest the wisdom of delaying insurance policy payments.

*Glass v. United States* that an insurer had "negligently and erroneously paid the entire [policy] proceeds prematurely" to the primary beneficiary and murderer of the insured. 506 F.2d at 382–83; *see also Weed,* 288 F.2d at 464 (payment by insurer to primary beneficiary "without knowledge of facts vitiating the claim will prevent a second recovery by another claimant"); *McDuffie,* 160 F.Supp. at 544 (insurer "had ample notice that there was a sufficient cloud" on primary beneficiary's claim to justify an interpleader action).

■ We recognize the duty of an insurer to disburse policy proceeds reasonably absent explicit legislative direction to the contrary. We are mindful that:

> [S]tatutes in derogation of the common law must be strictly construed, so that if the legislature wishes to abrogate rights that would otherwise be available under the common law, it must manifest its intent either expressly or by clear implication.

*Van Waters & Rogers,* 840 P.2d at 1076; *Farmers Group, Inc. v. Williams,* 805 P.2d 419, 422–24 (Colo.1991). Section 15–11–803 does not apply without a plea of guilty, nolo contendere, or a conviction, and in the absence of preemptive statutory law, common law negligence rights remain.

Where the death of an insured is criminally suspicious but there has been no formal plea or conviction, interpleader offers a means by which an insurer may protect itself from double liability. *Overstreet,* 950 F.2d at 940 ("An insurer faced with potential conflicting claims by a possible slayer and the insured's estate may absolve itself of excess liability by paying the proceeds into the registry of the court and filing an action in interpleader to determine the proper recipient."); *Glass,* 506 F.2d at 382 ("Having opted not to interplead and thus, in effect, protect itself as against any and all claimants under the umbrella of the jurisdiction of the court, the Government cannot now be heard to complain that the contingent beneficiaries had an obligation to voice their objection to its payment made to [the murderer of the insured] prior to her conviction."); *McDuffie,* 160 F.Supp. at 544 (insurer easily could have protected itself against conflicting claims by

interpleader); *Harper,* 662 P.2d at 1274 ("By interpleading the contingent beneficiary so that he might have an opportunity to protect his rights, Prudential could have protected itself from a double liability."). In this case, the trial court noted that the insurers could have availed themselves of interpleader to avoid dual liability. In denying the insurers' motion for summary judgment, the court stated, "[t]he carriers could have protected themselves from the possibility of a double payment by interpleading the policy proceeds into the court and thereupon giving notice to all parties in interest and letting the court decide who was entitled to the proceeds." As the defendant insurers point out, however, an insurance company that interpleads funds without grounds to believe there are rival claimants to the funds may be subject to claims by the primary beneficiaries, including claims for bad faith breach of an insurance contract. The question of whether to interplead policy proceeds is a business decision that insurers must make based on their potential liabilities.

## IV.

■ The insurers contend, however, that common law principles concerning payment of life insurance policy proceeds to one who has murdered the insured are preempted by the slayer statute. We disagree.

The slayer statute does not preempt the common law regarding either the disqualification of insurance beneficiaries or the duty of insurers to disburse policy proceeds in a reasonable manner. First, the Colorado judiciary has consistently interpreted the slayer statute as limited to its plain provisions. *Strickland,* 128 Colo. at 224–25, 250 P.2d at 201; *Smith,* 121 Colo. at 422–23, 218 P.2d at 517–18; *McCormick,* 784 P.2d at 810. Resort to common law principles is preempted regarding issues to which the slayer statute expressly applies or where there are other pertinent statutory provisions. However, if the slayer statute is inapplicable and no other applicable statutes exist, we will rely on the common law. *See* § 15–10–103, 6B C.R.S. (1987) ("Unless displaced by the particular provisions of this code, the principles of law and equity supplement its provi-

sions."). The courts in *Smith, Strickland,* and *McCormick* all applied existing statutory rules of descent and distribution to devolution of a victim's estate where the killer-beneficiary was not disqualified under the terms of the slayer statute. *Strickland,* 128 Colo. at 223, 250 P.2d at 200; *Smith,* 121 Colo. at 427, 218 P.2d at 519; *McCormick,* 784 P.2d at 810.

However, in both *Smith* and *Strickland* we distinguished between the distribution of life insurance proceeds to a beneficiary who has murdered the insured, and killers' rights to inherit from their victims' estates. In *Smith* a husband killed his wife and then committed suicide. *Smith,* 121 Colo. at 419, 218 P.2d at 517. The husband was never convicted of his wife's death because of his suicide. *Id.* The slayer statute in effect at the time was limited to the disentitlement of convicted murderers, so we recognized that the husband could inherit the wife's interest in property they owned as tenants in common, pursuant to Colorado's laws of descent and distribution. *Id.* at 421–22, 427, 218 P.2d at 519. Similarly, by reason of the statutes concerning joint tenancy, the husband succeeded to his wife's interest in property held by them as joint tenants. *Id.* at 421–22, 218 P.2d at 519. This court held that "our position *with respect to the properties held either in joint tenancy or tenancy in common* is the same, namely: that the legislature has already preempted the field." *Id.* at 427, 218 P.2d at 519 (emphasis added). Nevertheless, in *Smith* this court reached a very different preemption conclusion with regard to the victim's life insurance proceeds. In that respect, this court noted that *both* parties "concede" that "a proper disposition of the proceeds of the insurance policies" would follow a " 'well-settled' " rule of common law that "where the beneficiary named in a life insurance policy causes the death of the named insured, he is barred from taking any of the proceeds." *Id.* at 420–21, 218 P.2d at 516 (quoting from the stipulation of the parties). In short, this court determined in *Smith* that although devolution of property held in tenancy in common or joint tenancy was preemptively governed by Colorado's laws of descent and distribution and its joint tenancy statute, the slayer statute *did not* preempt common law

rules barring killers from receiving their victims' life insurance policy proceeds.

Similarly, at the time of the *Strickland* case, the slayer statute was limited to disqualifying convicted murderers from inheriting from their victims. *Strickland,* 128 Colo. at 223, 250 P.2d at 200. In *Strickland,* a husband killed his wife, but was convicted only of voluntary manslaughter. *Id.* at 222, 250 P.2d at 199. The sole assets of the wife's estate were the proceeds of her life insurance policy. *Id.* The question that this court reviewed was whether the husband could receive the life insurance proceeds, not as a beneficiary but by inheriting through his wife's estate. *Id.* at 223, 250 P.2d at 200. We made clear that the legislature had preempted the field regarding the disposition of property descending under applicable statutes of descent and distribution. *Id.* at 224–25, 250 P.2d at 201.

However, this court made equally clear in *Strickland* that a killer's recovery of a victim's life insurance proceeds was barred by well-established common law principles. *Id.* at 223, 225, 250 P.2d at 200–201. We offered the following explanation for why the preempted area of inheritance might allow killers to profit from their wrongs, even though the common law would bar killers from directly receiving their victims' life insurance policy proceeds as beneficiaries:

> It is also urged that, inasmuch as the estate in this case consists of the proceeds of a life insurance policy, the situation should be treated in the same way as if [the killer] were the beneficiary of the life insurance policy.... Whereas the amount payable under a policy upon the death of an insured to a named beneficiary is payable in the amount specified in the policy, undiminished by any claims of others, in an estate proceeding the heir takes only after creditors have been satisfied and also subject to a sharing in the net amount with other heirs. It might well be that the various claims against an estate of the size in the instant case would substantially reduce the net amount payable. It is only because [the killer] happens to be the sole heir under the law of descent and distribution, due to the fact that his wife left no

lineal descendants, that the argument of counsel [to apply the common law barring killers from receiving their victims' life insurance policy proceeds] appears even plausible....

....

... In the instance case [the killer] is not claiming under an insurance policy, but as the sole heir of the estate of his wife subject to all just debts and expenses of administration.

*Id.* at 225–26, 250 P.2d at 201. Once again, this court drew a distinction between the preempted area of descent and distribution and the area governed by common law barring disbursement of victims' insurance policy proceeds to beneficiaries who kill the insured. This distinction, however tenuous in practice, is based on considerations that consistently have been respected and preserved by both the Colorado legislature and judiciary. *See also Harper,* 662 P.2d at 1270 (" 'That any one should be given property as the result of his crime is abhorrent.... The horror and repulsion caused by such an atrocity, however, do not warrant the court in reading into a plain statutory provision an exception which the statute itself in no way suggests.... There is a manifest difference, however, between private grants, conveyances and contracts of individuals and a public act of the legislature [regarding descent and distribution]. It might be that a person would not be permitted to avail himself of the benefits of an insurance policy the maturity of which had been accelerated by his felonious act. Many considerations of an equitable nature might affect the operation or enforcement of a grant or contract of a private person which would have no application or bearing on a statute enacted by the legislature.' ") (quoting *McAllister v. Fair,* 72 Kan. 533, 84 P. 112, 113–14 (1906)); *accord Continental,* 285 F.2d at 560 ("An insurance policy is a commercial contract and will not be enforced contrary to the public policy of the state affected. The rights, duties and obligations arising under or in connection with an insurance policy are governed by the laws of contract, not the laws of wills or inheritance. Enforcement of a contract is denied to a defrauder. From the standpoint of public morality there is an even greater reason

to deny it to a murderer or his representative."); *cf. Smith,* 121 Colo. at 426–27, 218 P.2d at 519.

Furthermore, the slayer statute does not wholly preempt traditional negligence principles, including the duty of insurers to disburse policy proceeds reasonably. Insurers' duties are limited in part by the notice provision of section 15–11–803(6), but that provision on its face provides protection only for insurers making payments to persons disqualified under section 15–11–803(3). § 15–11–803, 6B C.R.S. (1987). When section 15–11–803 is inapplicable, insurers must respect traditional negligence principles. To hold otherwise would allow for shockingly inequitable results. For instance, an insurer cannot disburse policy proceeds shortly following a murder, where the insurance company was informed that the primary beneficiary was the principal suspect and would be charged and prosecuted soon, but where the primary beneficiary had yet to plead guilty or nolo contendere, let alone be convicted, and contingent beneficiaries had not had time to file a notice of claim. The insurers concede this point in their briefs. Nevertheless, such a result is apparently justified if one believes either (1) that the slayer statute applies retroactively to a disbursement that occurs prior to a conviction or plea of guilty or nolo contendere, or (2) that the slayer statute preempts an insurer's obligation to disburse policy proceeds in a reasonable manner. It is untenable that the slayer statute is so broad as to preempt not only Colorado's laws of descent and distribution but also the common law regarding both disbursement of life insurance proceeds to beneficiaries and insurers' obligation to disburse policy proceeds in a reasonable manner.

## V.

The district court submitted this case to the jury on a negligence theory. This case does not present for our inquiry whether the defendant insurers were negligent: that issue was determined by the jury and is not presented on appeal. The insurers have not attacked the adequacy of evidence in this case, choosing instead to rely on the broad

statutory bar allegedly found in section 15–11–803(6).

In short, we find that sections 15–11–803(3) and 15–11–803(6) are inapplicable to this case because Sharon Nelson had not pled guilty or nolo contendere, or been convicted of murdering Mr. Nelson, when the insurance proceeds were disbursed. The district court's reliance on a negligence standard in assessing the legality of the insurers' conduct was appropriate in view of (1) Colorado common law that killers cannot receive life insurance proceeds from their victims, and (2) insurers' long-recognized obligation to disburse insurance policy proceeds in a reasonable manner.

For the foregoing reasons, we reverse the judgment of the Colorado Court of Appeals and remand to that court for consideration of the issues raised on appeal and cross-appeal but not previously resolved.

VOLLACK, C.J., dissents, and ERICKSON and KOURLIS, JJ., join in the dissent.

Chief Justice VOLLACK dissenting:

The majority holds that section 15–11–803, 6B C.R.S. (1987), does not apply to this case and instead applies common law principles to resolve the issue before us. The majority reverses the court of appeals, holding that the trial court properly relied on a negligence standard in assessing the legality of the respondents' conduct in disbursing the subject insurance proceeds. I dissent because the majority relies on common law principles to resolve this case. Instead, I would hold that section 15–11–803 applies to the instant case and relieves the respondent insurance companies of any liability to the petitioners. I also dissent because I disagree with the majority affirming the trial court's application of the negligence standard to the respondents' conduct in this case.

### I.

In 1983, Perry Nelson purchased term life insurance policies from respondents Western States Life Insurance (Western States) and North American Life & Casualty Company (North American Life) (hereinafter referred to jointly as "the insurance companies"). The Western States policy designated the Nelson Family Trust as the primary beneficiary and Perry Nelson's estate as the contingent beneficiary. The North American policy designated Perry Nelson's wife, Sharon Nelson, as the primary beneficiary and their two minor children, Perry E. Nelson and Brooke Erin Nelson, as the contingent beneficiaries. These two minor children, along with Perry Nelson's three children from a previous marriage, are the petitioners.

Perry Nelson disappeared on July 23, 1983, while on a trip to the Denver area from his home near Trinidad, Colorado. His automobile was found in the river alongside the highway in Clear Creek Canyon. At that time, law enforcement officials were unable to find Perry Nelson's body. Shortly thereafter, the insurance companies jointly engaged Equifax Services to investigate the insured's disappearance. The investigation focused on a possible disappearance because Perry Nelson's body was not found. Equifax performed an exhaustive investigation over a period of approximately ten months.

On February 18, 1984, upon petition by Sharon Nelson, the Las Animas District Court issued an order declaring that Perry Nelson died on July 23, 1983. The investigator for Equifax testified that he had doubts regarding Perry Nelson's death, but these doubts did not rise to the level of what he called a "well-founded suspicion." Additionally, several facts indicated that Sharon Nelson was not implicated in Perry Nelson's death, so the insurance companies did not conclude that Sharon Nelson caused her husband's death.

In August of 1984, approximately thirteen months after his disappearance, Perry Nelson's body was found. The unanimous opinion of the investigators for the sheriff's department and the coroner's office was that Perry Nelson had died as the result of an accidental drowning. The sheriff's final case report indicated that there was no suspicion of foul play or of criminal activity with regard to Perry Nelson's death. The death certificate for Perry Nelson, dated Septem-

ber 18, 1984, also reflected the conclusion that his death was an accident.

Based upon these official records and findings, the insurance companies concluded that Perry Nelson died accidentally, and paid the proceeds of the subject life insurance policies to the designated beneficiary, Sharon Nelson. At no time prior to payment of the insurance proceeds did either North American or Western States receive notice of the petitioners' competing claims to the insurance proceeds. At the time that the proceeds were paid by the insurers, there was no ongoing police investigation or pending prosecution, and Sharon Nelson had not confessed to or been charged with the murder of Perry Nelson.

Several years later, during an unrelated investigation, Sharon Nelson confessed that she had persuaded her friend to murder her former husband, Perry Nelson. On June 7, 1989, Sharon Nelson pleaded guilty to the murder of Perry Nelson. Sharon Nelson's conviction occurred six years after the insured's death and nearly five years after the insurance proceeds had been paid by the insurance companies.

Prior to the trial in this matter, the petitioners recovered a judgment against Sharon Nelson, in a separate proceeding, in the principal amount of $565,000. This judgment included the amount of insurance proceeds previously received by her from the insurance companies. Unfortunately for the petitioners, Sharon Nelson dissipated all of the proceeds prior to confessing to the murder.

The petitioners then brought an action against the respondents to recover the life insurance proceeds that had been paid to Sharon Nelson. The petitioners claimed that the life insurance companies were in breach of contract and were negligent in failing to give them, as contingent beneficiaries, prior notice that the insurance proceeds were to issue and in failing to institute interpleader proceedings. The life insurance companies argued that section 15–11–803(6), 6B C.R.S. (1987), relieves them of any liability to the petitioners because the petitioners failed to give written notice of a prospective claim to the proceeds prior to the time that the proceeds were distributed. The jury found that the life insurance companies were negligent

and the trial court entered an award to the petitioners in the amount of $200,000 plus interest.

The life insurance companies then appealed the jury verdicts, again asserting that the petitioners' noncompliance with the statutory notice requirements relieves the insurance companies of any liability to the petitioners. The court of appeals agreed with the insurance companies, holding that the notice provision of section 15–11–803(6) precludes the petitioners from asserting claims against the respondent insurance companies because the petitioners failed to provide written notice of their prospective claims prior to distribution of the insurance proceeds.

## II.

### A.

The majority reverses the court of appeals, holding that section 15–11–803, 6B C.R.S. (1987), the so-called "slayer statute," does not apply to this case. The majority states that this provision is inapplicable to the case at bar because "[t]he statutory scheme is limited to disentitlement of named beneficiaries who have been established as perpetrators of specific homicides by the means set forth" in the statute. Maj. op. at 84. I dissent because I would hold that the court of appeals correctly held that section 15–11–803 is applicable.

Section 15–11–803, as a whole, addresses the effect of homicide on intestate succession, wills, joint assets, life insurance, and beneficiary designations. The slayer statute is divided into subsections that specifically address each of the interests which may be affected in the event the beneficiary kills the decedent. In particular, section 15–11–803(3), 6B C.R.S. (1987), provides:

A named beneficiary of a bond, life insurance policy, or other contractual arrangement who kills the principal obligee or the person upon whose life the policy is issued and, as a result thereof, is convicted of, pleads guilty to, or enters a plea of nolo contendere to the crime of murder in the first or second degree ... is not entitled to any benefit under the bond, policy, or oth-

er contractual arrangement, and it becomes payable as though the killer had predeceased the decedent.

This statute is applicable to this case because Colorado precedent has held that the slayer statute preempts the field regarding the circumstances under which a slayer is disqualified from receiving all types of property. *Strickland v. Wysowatcky*, 128 Colo. 221, 250 P.2d 199 (1952); *Smith v. Greenburg*, 121 Colo. 417, 218 P.2d 514 (1950). Our courts have always looked to the slayer statute as the exclusive means of disqualifying a slayer from receiving the victim's property and we have never fashioned a common law rule to void the slayer's receipt of property from the victim on the grounds of public policy. *See, e.g., id.* When this court has held the slayer statute to be inapplicable because the particular circumstances of the case were not covered by the statute, we have simply allowed the slayer to receive property from the victim. *Id.*

For example, in *Smith*, the version of the slayer statute in force at that time provided that "any person convicted of murder in the first degree or second degree ... shall not take, either by descent, devise, inheritance, *or any other manner*, any of the estate, real or personal, of [the] deceased." *Smith*, 121 Colo. at 422, 218 P.2d at 517 (emphasis added). The *Smith* court reversed the trial court because the trial court failed to base its ruling on the slayer statute and instead applied a common law rule that "no one shall be permitted to profit by his own wrong." Id. In *Smith*, we held that the legislature had already fixed the standards and rules to be applied for disqualifying an heir who causes the death of the intestate, and such legislative standards must be applied. *Id.*

Contrary to the majority's assertion, however, the *Smith* court's holding was not limited to statutory rules of descent and distribution. Although the specific facts of the *Smith* case involved issues of descent and distribution, this court held that the slayer statute, as a whole, fixed the legislative standards for disqualifying slayers from taking property of the deceased by descent, devise, inheritance, *or any other manner*. *Id.* at 422–23, 218 P.2d at 517. Our slayer statute

now explicitly includes insurance proceeds as one of the means by which slayers are prohibited from taking property, thereby including insurance proceeds in the statute's preemptive range.

The majority also states that the *Smith* court "distinguished between the distribution of life insurance proceeds to a beneficiary who has murdered the insured, and killers' rights to inherit from their victim's estates." Maj. op. at 88. In *Smith*, however, the court simply accepted the parties' stipulation that where the beneficiary named in a life insurance policy causes the death of the named insured, he is barred from taking any of the proceeds. *Smith*, 121 Colo. at 421, 218 P.2d at 517. The court then turned to the novel issue of whether a tenant in common who killed the decedent could inherit property held in common with his victim, and held that Colorado's descent and distribution statutes allowed such a result because the slayer statute did not apply to the facts of this case. *Id.* at 422–23, 218 P.2d at 517. This does not change the *Smith* court's general holding that the slayer statute, as a whole, preempts the field regarding disqualification of slayers from taking property from their victims by descent, devise, inheritance, or any other means.

Similarly, in *Strickland*, this court reiterated that the legislature has preempted the field regarding disqualification of beneficiaries and has thus displaced the common law. *Strickland*, 128 Colo. at 224, 250 P.2d at 200–01. We refused to engraft an exception upon the slayer statute merely because the common law forbids a person to take advantage of his own wrong, or because public policy forbids a person from obtaining property by his own crime. *Id.* We therefore held that a statutory right cannot be defeated by application of a common law principle. *Id.; see also Seidlitz v. Eames*, 753 P.2d 775, 777 (Colo.App.1987). In *Strickland*, where the circumstances precluded application of the slayer statute, we again allowed the slayer to gain property from his victim rather than impose common law principles to resolve the case. *Strickland*, 128 Colo. at 224, 250 P.2d at 200–01.

The majority states that *Strickland* draws a distinction between slayers who attempt to take property from their victims via inheritance, which is preempted by the slayer statute, and slayers who attempt to take property from their victims via insurance proceeds, which is supposedly not preempted by the slayer statute. However, the *Strickland* court merely distinguished inheritance and insurance proceeds to the extent that, in each case, different amounts are payable to the heir or beneficiary. *Id.* at 225, 250 P.2d at 201. This distinction does not equate with different applications of the preemptive slayer statute to cases involving insurance proceeds and those involving inheritance. Thus, in accordance with our precedent, we must construe Colorado's current slayer statute, including its provision for insurance proceeds, as a preemptive statute, just as its predecessor was construed as such.

Our previous holdings that the enactment of the slayer statute preempts the field regarding disqualification of beneficiaries has significant consequences. First, by definition, field preemption results from a judicial determination that the legislation is so comprehensive that it was intended by the legislature to remove an entire subject from regulation by other governmental branches. *Evans v. Board of County Comm'rs,* 994 F.2d 755, 760 (10th Cir.1993); *Frontier Airlines, Inc. v. United Air Lines, Inc.,* 758 F.Supp. 1399, 1407 (D.Colo.1989). Second, as a consequence of preemption and the doctrine of separation of powers, a court is prohibited from interfering with the legislative branch of government. *Colorado State Dep't of Health v. Geriatrics,* 699 P.2d 952, 959 (Colo. 1985). Thus, a court is prohibited from adding an important qualification to a statute. *Dodge v. Department of Social Servs.,* 657 P.2d 969, 975 (Colo.App.1982); *Estate of Burron,* 42 Colo.App. 141, 594 P.2d 1064, 1065 (1979). Questions of public policy are for the legislature, and when that policy is declared, the declaration binds the courts. *Smith,* 121 Colo. at 427–28, 218 P.2d at 520.

The majority states that section 15–11–803 does not apply because the statute "does not address the issue in this case, in which payment was made before the primary beneficia-

ry's guilt was established." Maj. op. at 84. The majority relies on the statutory phrase "becomes payable ..." as meaning that the beneficiary's guilt must be established before insurance proceeds are paid in order for the statute to apply. However, this phrase merely means that once the beneficiary's guilt is established, the beneficiary is no longer entitled to receive the insurance proceeds. Thus, the majority improperly adds a qualification to the statute that the beneficiary's guilt must be adjudicated within a certain time frame. However, precisely because the statute does not dictate the time in which the primary beneficiary's guilt must be established, we must presume that this preemptive statute applies whenever such guilt is established.

The legislature only restricted section 15–11–803(3) to situations where a beneficiary was convicted of, or pled guilty or nolo contendere to, the murder or manslaughter of the policy holder. In this case, the beneficiary did in fact plead guilty to murder of the insured policyholder. The mere fact that Sharon Nelson did not enter her guilty plea until after the insurance companies paid the proceeds to her does not preclude application of the slayer statute to this case. Therefore, the majority improperly imposes a limitation on the time in which a beneficiary's criminal guilt must be established in order to apply section 15–11–803. In view of the clear precedent holding that the slayer statute is the exclusive means by which beneficiaries are disqualified if they cause the death of the insured, the court of appeals correctly held that the slayer statute applies to this case.

### B.

In applying the slayer statute to this case, I would hold that the respondent insurance companies are not liable to the petitioners here because the respondents are insulated from liability by section 15–11–803(6), 6B C.R.S. (1987), which provides:

> Any insurance company ... making payment according to the terms of its policy or obligation is not liable by reason of this section unless prior to payment it has received ... written notice of a claim under this section.

This provision of the slayer statute grants immunity and releases an insurance company from liability when it pays a claim according to the terms of the policy prior to receiving notice of a competing claim. As the court of appeals stated:

> Prior to this case, no Colorado appellate court has addressed this notice provision. However, other jurisdictions which have considered a notice requirement similar to the one at issue here have held that if, as here, the insurers have performed their contracts according to their terms and in accord with the notice provision of the statute, they are "exonerated from further liability thereon and that [plaintiffs], having failed to give timely notice of [their] claim[s] to [insurers], must be relegated to [their] remedy against the named beneficiary who received the proceeds."

*Lundsford v. Western States Life Ins.*, 872 P.2d 1308, 1311 (Colo.App.1993) (quoting *Miller v. Paul Revere Life Ins. Co.*, 81 Wash.2d 302, 501 P.2d 1063 (1972)).

Because the petitioners failed to provide written notice to the respondents prior to payment of the insurance proceeds to Sharon Nelson, I would affirm the court of appeals' holding that the notice provision of section 15–11–803(6) precludes the petitioners' claim against the respondents. In the absence of the notice that is required by section 15–11–803(6), the respondents simply cannot be held liable to the petitioners after the respondents performed the insurance contracts according to their terms by paying the insurance proceeds to the primary beneficiary. Because I believe that section 15–11–803 applies to this case, I would affirm the court of appeals and hold that the insurance companies are relieved from liability to the petitioners.

### III.

The majority also holds that "[t]he district court's reliance on a negligence standard in assessing the legality of the insurers' conduct was appropriate in view of (1) Colorado common law that killers cannot receive life insurance proceeds from their victims, and (2) insurers' long-recognized obligation to disburse insurance policy proceeds in a reasonable manner." Maj. op. at 89. Assuming, *arguendo,* that common law principles apply, I further dissent because I would hold that the district court erroneously relied on a negligence standard to determine whether the insurance companies acted properly in disbursing the insurance proceeds to Sharon Nelson.

### A.

The majority states that, "in the absence of an applicable statute, a killer cannot receive the proceeds of a victim's life insurance policy." Maj. op. at 85. To the contrary, our precedents have explicitly held that a beneficiary who is not disqualified pursuant to the express terms of the slayer statute is not disqualified from receiving the benefits of his or her crime. *Seidlitz,* 753 P.2d at 777; *People v. McCormick,* 784 P.2d 808, 810 (Colo.App.1989).

Additionally, prior to the enactment of Colorado's first slayer statute in 1923, the common law did not preclude a murderer from receiving the victim's property. *Smith,* 121 Colo. at 422–23, 218 P.2d at 517–18. This followed the majority view at the time that, in the absence of a statute which expressly disqualified the slayer, the slayer could inherit from his or her victim. *Smith,* 121 Colo. 417, 218 P.2d 514; *Wadsworth v. Siek,* 23 Ohio Misc. 112, 254 N.E.2d 738 (1970); *In Re Duncan's Estates,* 40 Wash.2d 850, 246 P.2d 445 (1952). Thus, if section 15–11–803 does not apply in this case, as the majority holds, then the common law would not disqualify Sharon Nelson from receiving the insurance proceeds from her victim, Perry Nelson. Consequently, the petitioners would have no claim of action against the respondent insurance companies under the facts of this case.

### B.

The majority also holds that the respondent insurance companies cannot rely on the immunity and release of liability conferred on them by section 15–11–803(6) because the insurers failed to satisfy certain common law duties. The majority states that, "[i]f an insurer is on notice of facts suggesting that

the primary beneficiary is not entitled to a disbursement of policy proceeds, the insurer has a duty to make a reasonable inquiry and to withhold payment until its suspicion is dispelled." Maj. op. at 86.

The majority cites *Harper v. Prudential Insurance Co. of America*, 233 Kan. 358, 662 P.2d 1264 (1983), for the proposition that "an insurance company is to be relieved from liability only if it paid the proceeds to the primary beneficiary in good faith and without knowledge of facts which may defeat the primary beneficiary's claim." *Id.* at 1274 (emphasis omitted). The *Harper* court held that the test of good faith required the insurance company to (1) conduct a reasonable prepayment investigation, and (2) not pay the insurance proceeds prematurely, before law enforcement agencies conclude their investigation. *Id.* at 1273. Our case is distinguishable from *Harper* because, in *Harper*, the insurance company's investigator advised the insurer, with ninety-nine percent certainty, that the beneficiary had killed the insured. *Id.* at 1274. Moreover, in *Harper*, law enforcement agencies had not yet completed their investigation of the insured's death. *Id.*

In the instant case, the insurance companies paid the proceeds to Sharon Nelson in good faith and without knowledge of facts which may have defeated her claim to the proceeds. The insurance companies conducted a ten-month investigation before they paid Perry Nelson's insurance benefits to Sharon Nelson. Although the insurance companies had some suspicion regarding Perry Nelson's death, they had no knowledge that Sharon Nelson caused his death.[1] Furthermore, the insurance companies did not pay the proceeds until law enforcement agencies had finished their investigation of Perry Nelson's death and concluded that he died as a result of an accidental drowning. The respondents based their decision to pay the insurance proceeds to Sharon Nelson on the official

determination of cause of death. Perry Nelson's death was not identified as a murder until several years after the respondents paid the insurance proceeds to the primary beneficiary in accordance with their contract. Thus, the insurance companies did not violate the common law duties delineated by the *Harper* court.

Additionally, both the Colorado Probate Code and the statutory scheme which regulates insurance companies seek to promote the prompt payment of insurance proceeds. § 15–10–102, 6B C.R.S. (1987); § 10–3–1104(h), 4A C.R.S. (1994). In particular, section 10–3–1104(h) provides that it is an unfair claim practice for an insurance company to not attempt in good faith to effectuate a prompt settlement of claims in which liability has become reasonably clear. Here, the respondent insurance companies properly fulfilled their duty not to make premature payment of insurance proceeds and still make prompt payment of those proceeds. Merely based on hindsight, we cannot impose a higher duty on the respondent insurance companies to further investigate Perry Nelson's death until they could discover that Sharon Nelson had caused Perry Nelson's death and was thus disentitled to his insurance proceeds.

The majority also suggests that if insurers suspect that the primary beneficiary is not entitled to policy proceeds, the insurers can protect themselves by interpleading the proceeds. The majority cites *Glass v. United States*, 506 F.2d 379 (10th Cir.1974), and *McDuffie v. Aetna Life Insurance Co.*, 160 F.Supp. 541 (E.D.Mich.1957), for the proposition that when an insurance company has knowledge of suspicious circumstances, it should interplead the proceeds of the policy. Neither *Glass* nor *McDuffie* imposes a common law duty to file an interpleader action. Rather, the courts in *Glass* and *McDuffie* recognized that interpleader is a device to protect the insurance company from double

---

1. The majority acknowledges that "the Equifax report contains extensive *but highly inconclusive* information" casting suspicion on Sharon Nelson for the death of Perry Nelson. Maj. op. at 82 n. 8 (emphasis added). The respondents did not inform law enforcement agencies of this information because the information was not in the sole possession of the respondents. In fact, much of

this information was learned from the investigating agencies themselves (i.e., the Las Animas County Sheriff's Department, the Colorado State Patrol, and the Jefferson County Sheriff's Department). Despite the law enforcement agencies' knowledge of such suspicious information, the agencies concluded that there was no foul play and that Perry Nelson died accidentally.

liability in the absence of any statutory protection. *Glass*, 506 F.2d at 382; *McDuffie*, 160 F.Supp. at 544.

However, an interpleader action is not necessary to protect an insurance company paying under a statutory grant of immunity, such as that found in subsection (6) of the Colorado slayer statute. *See Metropolitan Life Ins. Co. v. Prater*, 508 F.Supp. 667 (E.D.Ky.1981). The *Glass* and *McDuffie* cases did not involve slayer statutes and therefore did not consider whether interpleader was required in light of a notice requirement similar to section 15–11–803(6). The Colorado slayer statute provides that an insurance company is not subject to any further liability if it pays the insurance proceeds "according to the terms of its policy," such as by paying the designated beneficiary, prior to receipt of written notice of a competing claim. An interpleader action would be indicated by section 15–11–803(6) only if written notice of a competing claim were actually received prior to payment. An interpleader proceeding thus would be inappropriate for the instant case. Even if the common law were applicable here, I would affirm the court of appeals because the insurance companies fulfilled the common law duty to pay insurance proceeds to the primary beneficiary in good faith and without knowledge of facts which may have defeated her claim to the proceeds.

### IV.

I dissent because I believe the majority erroneously relies on common law principles to resolve the issues presented before us. Instead, I would hold that section 15–11–803 applies to this case and relieves the respondent insurance companies of any liability to the petitioners. I also dissent because I disagree with the majority affirming the trial court's application of the negligence standard to the respondent's conduct in this case. I would therefore affirm the court of appeals.

I am authorized to say that Justice ERICKSON and Justice KOURLIS join in this dissent.

